# United States Court of Appeals
## For the First Circuit

No. 16-2122

NICOLE JOHNSON, Parent; NS, Minor,

Plaintiffs, Appellants,

v.

BOSTON PUBLIC SCHOOLS; BUREAU OF SPECIAL EDUCATION APPEALS,

Defendants, Appellees,

EILEEN NASH; LYNN GRAHAM O'BRIEN; JOAN CURRAN; LITA O'MALLEY;
JEREMIAH FORD; MARCIE GOLDOWSKI; ELIZABETH DRAKE; REBECCA HART;
TERELLE CLARK; SUE GIBBONS; JENNIFER HARRIS; DENISE ENG;
CHILDREN'S HOSPITAL; MELISSA BROWN; THOMAS CHANG, Superintendent
of Schools for the City of Boston; ANDREA ALVES-THOMPSON; ANN
MARIA ACCOMANDO,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Lynch, Stahl, and Thompson,
Circuit Judges.

Michael C. Walsh, on brief for appellants.
Eugene L. O'Flaherty, Corporation Counsel, with whom Karen G.
Castrada, Assistant Corporation Counsel, on brief for appellee
Boston Public Schools.

Maura Healey, Attorney General, with whom Bryan Bertram, Assistant Attorney General, on brief for appellee Bureau of Special Education Appeals.

_____

October 12, 2018

_____

**STAHL**, **Circuit Judge**.    Plaintiff-Appellant Nicole Johnson, acting on behalf of her minor child ("N.S."), initiated a proceeding before the Massachusetts Bureau of Special Education Appeals ("BSEA") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. Johnson sought, inter alia, placement for N.S. in a school outside of the Boston Public Schools ("BPS") system.    The hearing officer ultimately ruled against all of Johnson's claims in a proceeding she now contends was tainted by multiple errors.    On review, the district court upheld this determination and granted summary judgment to Defendants-Appellees BPS and the BSEA.    We affirm.

## I. Statutory Framework and Factual Background

### A.

We begin by describing the statutory framework of the IDEA, which provides necessary context for understanding the factual and procedural history at issue.    The IDEA offers states partial federal funding for special education of children with qualifying disabilities.    20 U.S.C. § 1412(a).    In exchange, states receiving IDEA funds commit to providing all of those disabled children within their jurisdiction "a free appropriate public education ('FAPE') in the least restrictive environment possible."    Sebastian M. v. King Philip Reg'l Sch. Dist., 685 F.3d 79, 81 (1st Cir. 2012) (citing 20 U.S.C. § 1412(a)(1), (5)).    A FAPE must include both "specially designed instruction, at no cost

to parents, to meet the unique needs of a child with a disability" and "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(9), (26), (29). "If a school system is unable to furnish a disabled child with a FAPE through a public school placement, it may be obliged to subsidize the child in a private program." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012) (quotation marks and citation omitted).

"The primary vehicle for delivery of a FAPE" is an Individualized Education Program ("IEP"). Id. (internal quotation marks and citations omitted). "An IEP must be custom-tailored to suit a particular child," Sebastian M., 685 F.3d at 84 (citation omitted), and must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, -- U.S. -, 137 S. Ct. 988, 999 (2017). An IEP need not, however, offer the student "an optimal or an ideal level of educational benefit[.]" Lessard v. Wilton Lyndeborough Coop. Sch. Dist. (Lessard I), 518 F.3d 18, 23-24 (1st Cir. 2008) (citations omitted).

While the IDEA envisions a process in which parents, educators, specialists, and others collaborate to develop the IEP, it also contains dispute resolution mechanisms for parents who are

- 4 -

dissatisfied with some element of the IEP.  This includes both a formal mediation process, 20 U.S.C. § 1415(e), and, separately, an "impartial due process hearing" held before a designated state or local education agency, id. § 1415(f).[1]  In Massachusetts, these processes take place before the BSEA.  See 603 Mass. Code Regs. 28.08.

Finally, parents may bring a civil action challenging the outcome of the due process hearing in either state or federal court.  20 U.S.C. § 1415(i)(2)(A); 603 Mass. Code Regs. 28.08(6).

**B.**

What follows is the factual and procedural history of the case "as supportably found by the district court," Sebastian M., 685 F.3d at 82, focusing on the facts necessary to adjudicate this appeal.[2]

Johnson is the mother of N.S., a young male afflicted with significant deafness.  Although N.S. has a cochlear implant to assist with his hearing, nonetheless his hearing remains

---

[1] The Code of Massachusetts Regulations explicitly states that the due process hearing need not be preceded by a mediation.  603 Mass. Code Regs. 28.08(4)(b).

[2] The district court, in turn, relied largely on the BSEA's Findings of Fact, noting that "[n]either party has raised any objection to the Hearing Officer's factual findings, and both parties have relied upon these findings in their respective filings . . . ." Johnson v. Bos. Pub. Sch., 201 F. Supp. 3d 187, 192 n.1 (D. Mass. 2016).

substantially impaired. The parties do not dispute that N.S.'s disability places him within the coverage of the IDEA.

Beginning at age three and continuing for roughly two-and-a-half years, N.S. attended the Horace Mann School for the Deaf ("Horace Mann"), a public school in the BPS system. Several evaluations conducted near the time that N.S. initially enrolled at Horace Mann concluded that N.S.'s language skills were "significantly delayed" for his age. One of these reports noted that N.S. did not use words or word approximations or demonstrate signs of understanding spoken language, and placed his language abilities "at the 20 to 21 month level." Two of the evaluations recommended instruction that incorporated both American Sign Language ("ASL")[3] and spoken communication.

N.S.'s IEP team first met in October 2011 to devise a plan for the 2011-12 school year. The resulting plan called for N.S. to be placed in a "substantially separate classroom . . . taught by a teacher for the deaf," and for instruction using both ASL and spoken English. Pursuant to Johnson's wishes, the goal of the IEP was for N.S. "to be mainstreamed . . . .[,] preferably in a parochial school."

---

[3] Comments by educators, clinicians, and others in the record refer variously to ASL, "sign language," "signing," and other, similar terms. For accuracy, we use the terms as they appear in the record.

N.S.'s IEP team met again roughly one year later to update the IEP for the 2012-13 school year. See 20 U.S.C. § 1414(d)(4)(A) (requiring review and revision as needed of IEP at least annually). The IEP noted several areas in which N.S. had improved during the previous year, including his identification of a small number of letters and numbers, understanding of some "simple, one-step directions when given in sign and speech within a contextual situation," and consistent detection of various sounds. These improvements notwithstanding, the team observed that N.S.'s language continued to lag significantly behind his age. The updated IEP recommended instruction in sign-supported spoken English and in ASL at Horace Mann as well as occupational therapy.

N.S.'s teachers and treating therapists reported that he made additional progress during the 2012-13 school year, including "spontaneously signing" some words, naming classmates and teachers in sign language, imitating words in sign, and attempting to approximate speech. Around the same time, clinicians at Boston Children's Hospital similarly observed that N.S. was beginning to express himself through signing, though he was "not yet speaking with clearly articulated speech," and scored N.S.'s receptive language skills at the two-year, two-month-old level. The Children's Hospital report urged continued use of "a combination

of spoken and signed language" to facilitate N.S.'s linguistic growth.

Despite this reported progress, Johnson informed the IEP team that she wished to limit N.S.'s instruction to sign-supported spoken English — excluding ASL instruction — as N.S.'s family did not use sign language at home. Although expressing concern about the request, in April of 2013 the IEP team modified the 2012-13 IEP to reflect Johnson's preference.

While progress reports for the period between January and June 2013 indicate that N.S.'s ability to communicate continued to improve, his progress was slow and the IEP team recommended that N.S. repeat kindergarten. Johnson rejected this recommendation, instead requesting that N.S. be promoted and placed in a class without "peers who used ASL or who had [] disabilities" other than hearing impairment. The administrative record indicates that Horace Mann expressed concern that it "did not have a class that met [Johnson's] demands."

In June 2013, N.S. lost his speech processor, a component of his cochlear implant that assists with processing sound, and it was not replaced for five months. Evaluations prior to, during, and after that period note N.S.'s inconsistent use of the device and stressed the importance to his linguistic development of using the processor regularly.

These and other interactions with Johnson found in the administrative record show numerous statements by educators and clinicians reporting that N.S.'s progress was negatively affected by Johnson's intransigent opposition to the use of ASL and, later, sign-supported spoken English in N.S.'s education and at home, his inconsistent use of the cochlear processor, difficulty contacting Johnson, and her apparent lack of follow-up on appointments with and recommendations given by various hearing and speech specialists.

N.S. underwent an unscheduled speech and language evaluation in October 2013 to address Johnson's continuing concerns that N.S.'s spoken English skills were not advancing at a sufficient rate. This evaluation included a comparison of N.S.'s receptive and expressive language abilities using both spoken English only and sign-supported spoken English. The receptive language assessments in particular found that, when using sign-supported English, "given the use of single word signs, [N.S.'s] ability to understand vocabulary words [was] similar to that of same aged, hearing peers." Using sign-supported spoken English, he also apparently demonstrated some ability to understand negatives in sentences, make inferences, understand the use of objects, and follow commands without the use of gestural cues, and to understand some higher level academic skills. In contrast, during the spoken English assessment, N.S.'s correct

identification of vocabulary words was "similar to chance" and the evaluator was not able to establish a baseline for testing of other concepts. Altogether, the evaluation concluded that N.S.'s linguistic abilities continued to be "significantly delayed," with scores on the various tests administered ranging from "severely impaired to average." As a result, the evaluator recommended that N.S. continue to receive instruction in both spoken and sign-supported spoken English as well as speech and language therapy. Other evaluations conducted at the same time likewise recommended that N.S. continue to receive instruction in sign-supported spoken English as well as spoken English.

Following the unscheduled evaluation, N.S.'s IEP team offered to amend the IEP to provide, inter alia, additional language therapy and other "direct services" while keeping N.S. at Horace Mann. Johnson rejected this proposal and, separately, proceeding pro se sought a hearing before the BSEA to challenge the 2013-14 IEP. Johnson sought out-of-district placement in a program focused solely on spoken English and reiterated her position that Horace Mann had inappropriately placed N.S. in classes with students with disabilities other than hearing loss. BSEA initially scheduled a hearing for November 2013, but postponed the hearing on several occasions.

In December 2013, progress reports from Horace Mann indicated that N.S.'s language skills improved in a number of

areas, including construction of sentences and responses in spoken English, identification of letters, and writing. Johnson herself acknowledged these improvements in a letter thanking N.S.'s teacher. However, a Children's Hospital report from the same time frame indicated that N.S.'s language skills remained extremely limited and below age-level expectations.

Tensions between Johnson and Horace Mann expanded beyond disagreements regarding N.S.'s educational program. Following her February 2014 altercation with the vice principal, Johnson ceased sending N.S. to Horace Mann and eventually withdrew him from the school altogether. Thereafter, Johnson obtained an itinerant student number for N.S., allowing him to continue to receive services "consistent with his IEP."[4] Johnson, 201 F. Supp. 3d at 196.

At Johnson's request, the Clarke School for Hearing and Speech ("Clarke") performed an independent evaluation of N.S. in March 2014. That assessment indicated that N.S.'s performance was "consistent with a child who was just implanted" with a cochlear device, and concluded that his "present level of language [was] . . . insufficient to allow for adequate academic development." The

---

[4] Given that Johnson had rejected the proposed IEP for 2013-14, it is not clear from the record which IEP was operative at this time. The itinerant student designation did, however, allow N.S. to receive 11 auditory, speech, and language therapy sessions at the Clarke School for Hearing and Speech during the summer of 2014.

report attributed delays in linguistic skills to "a combination of factors: his inconsistent use of his cochlear implant . . . , inconsistent expectations regarding mode of communication, maladaptive behaviors and limited spoken or sign language skills."

In May 2014, N.S.'s IEP team amended its proposed plan in response to the Clarke evaluation, increasing the therapy and training already provided to N.S. and honoring Johnson's request to place N.S. in a classroom in which spoken English would be the primary language of instruction. BPS also funded auditory, speech, and language services to compensate for those missed between N.S.'s departure from Horace Mann and the end of the 2013-14 school year. Johnson, dissatisfied with BPS's offer, amended her BSEA hearing request to include a claim for compensatory services and other monetary damages.

## C.

Beginning in June 2014, Johnson and BPS attempted to resolve their dispute regarding (1) N.S.'s educational placement; and (2) compensatory services beyond those already agreed to by BPS. As part of these negotiations, BPS provided Johnson with information on programs available at Clarke and the READS Collaborative ("READS"). READS was described by the district court as "a private school . . . . offer[ing] an educational program for children with hearing disabilities." Johnson, 201 F. Supp. 3d at

197 n.2. Johnson accepted placement at READS in early October 2014, and N.S. began attending that school shortly thereafter.

On October 16, 2014, Johnson and BPS participated in a prehearing telephone conference with the BSEA, during which the parties attempted to negotiate a settlement in the presence of the hearing officer. BPS stated that it would only agree to a settlement that resolved both the placement and compensatory services claims, and the parties appeared to reach such an agreement during that call. The following day, however, Johnson informed BPS that she agreed to the placement proposal (which would leave N.S. at READS) but not the proposed compensation settlement. BPS promptly withdrew its offer to fund N.S.'s placement at READS.[5]

The BSEA hearing took place from November 17–19, 2014, and included extensive testimony and exhibits. On January 2, 2015, the hearing officer issued her decision, concluding that the

> proposed 2013-14 and 2014-15[6] IEPs offered [N.S.] a FAPE, and that [N.S.'s] progress during the two and a half years in [BPS] was effective given: the interruptions in services caused by [Johnson], problems with [N.S.'s] devices which caused him to spend lengthy periods without access to sound;

---

[5] BPS also notified Johnson that N.S.'s placement at READS would be terminated at that time. The BSEA subsequently entered a "stay-put" order which permitted N.S. to remain at READS pending resolution of the hearing.

[6] Despite the stay-put order, N.S.'s IEP team met in November 2014 to update the IEP for the coming school year. Johnson rejected this IEP and challenged it as part of the then-ongoing BSEA proceedings.

methodological limitations which impacted [N.S.'s] ability to acquire language; and the lack of effective access to language/communication in the home due to [Johnson's] belief that hearing sound without the ability to understand language was sufficient for N.S. to acquire language and learn to speak. Placement at READS, although appropriate, was unnecessary and largely duplicative of the program and services offered [to N.S.] at the Horace Mann School.

Notably for purposes of this appeal, the hearing officer also concluded that Johnson's credibility as a witness had been "seriously compromised" by her conduct during settlement negotiations.[7] The hearing officer also noted Johnson's "admitted bias against public schools" and related preference for parochial schools.

Thereafter, Johnson, proceeding pro se, commenced a civil action challenging the hearing officer's decision in the United States District Court for the District of Massachusetts. See 20 U.S.C. § 1415(i)(2)(A). Subsequently, on September 11, 2015, she retained counsel. Johnson both appealed the BSEA's determination that the 2013-14 and 2014-15 IEPs provided a FAPE and raised a number of claimed errors during the hearing itself.[8]

---

[7] Specifically, the hearing officer noted Johnson's "lack of memory and insistence that [BPS] had not explained multiple times that its offer for [sic] a READS placement was contingent on her acceptance of a settlement that fully disposed of all claims against [BPS], including compensatory services."

[8] Johnson also raised a number of non-IDEA claims before the district court. On Johnson's motion, the district court allowed her to submit an amended "bifurcated complaint" which separately

In support of her attack on the adequacy of the IEPs, Johnson introduced additional records, specifically N.S.'s 2015 progress reports from READS and select medical records from 2015.

BPS moved for summary judgment on the IDEA claims, and the BSEA subsequently joined that motion. The district court granted the motion and affirmed the BSEA's decision. This appeal followed.

## II. Discussion

Johnson raises a number of arguments on appeal. First, she contends that the district court erroneously concluded that she waived her argument that N.S. should be "mainstreamed" by failing to raise "mainstreaming" before the BSEA. Second, Johnson claims that the hearing officer's evaluation of her credibility included consideration of impermissible facts and evidenced bias against her. Finally, Johnson argues that the evaluation by both the district court and hearing officer of N.S.'s educational progress and the sufficiency of the challenged IEPs does not comport with the standard announced by the Supreme Court's decision in Endrew F., 137 S. Ct. 988.[9] We consider each of these claims in turn.

_____

addressed the IDEA and non-IDEA claims. The present appeal pertains only to the IDEA claims. Johnson has not appealed the non-IDEA claims, and the time to do so has passed.

   [9] Appellees initially argued that this court lacked jurisdiction over this appeal, as the order appealed dismissed only Johnson's IDEA claims and, they argued, failed to provide a

**A.**

District courts considering challenges to administrative IDEA decisions apply an intermediate standard of review that we have called "involved oversight."  D.B., 675 F.3d at 36.  Under that standard,

> [a] district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. However, that independence is tempered by the requirement that the court give due weight to the hearing officer's findings. As a result, a district court's review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard.

final judgment within the meaning of 28 U.S.C. § 1291.  Shortly after appellees filed their respective briefs, however, the district court entered an order dismissing Johnson's remaining, non-IDEA claims.  While the district court did not enter a "separate document" setting forth the judgment, as contemplated by Federal Rule of Civil Procedure 58, appellees concede that the second opinion constitutes a final judgment.  We agree: the district court's second order had the effect of denying Johnson all relief and more than 150 days have passed since it was entered. See Fed. R. Civ. P. 58(c)(2) ("For purposes of these rules, judgment is entered . . . when the judgment is entered in the civil docket under Rule 79(a) and the earlier of these events occurs: (A) it is set out in a separate document; or (B) 150 days have run from the entry in the civil docket."). The fact that the judgment has not yet been set forth on a "separate document" does not affect the validity of the appeal.  See Fed. R. App. P. 4(a)(7)(B). Likewise, even assuming that the initial appeal was premature because it was not accompanied by an entry of judgment, the subsequent entry of final judgment cures that deficiency.  See Barrett ex rel. Estate of Barrett v. United States, 462 F.3d 28, 34-36 (1st Cir. 2006) (premature appeal of dismissal of less than all claims ripened into timely appeal after entry of judgment under Federal Rule of Civil Procedure 58).  Accordingly, we conclude we have jurisdiction over this appeal. See Constien v. United States, 628 F.3d 1207, 1210-12 (10th Cir. 2010).

Id. at 35–36 (internal quotation marks, alterations, and citations omitted).

This court, however, applies a "more traditional" standard of review to its evaluation of the district court's decision. Id. at 36. We review the district court's determinations of law de novo, and its findings of fact for clear error. Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 76 (1st Cir. 2016). "Where the case raises mixed questions of law and fact, we employ a 'degree-of-deference continuum,' providing 'non-deferential plenary review for law-dominated questions' and 'deferential review for fact-dominated questions.'"[10] Id. at 76-77 (quoting Mr. I ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 10 (1st Cir. 2007)).

The majority of Johnson's challenges raise only questions of law. Her final claim of error, however, includes both a pure question of law, i.e. whether the district court applied the proper standard in evaluating N.S.'s educational progress, and a mixed question of law and fact, i.e. whether,

---

[10] Though this case comes to us following a grant of summary judgment, "a motion for summary judgment in an IDEA case is simply a vehicle for deciding the relevant issues, and the non-moving party is not entitled to the usual inferences in its favor . . . . [n]or does the presence of disputed issues of fact preclude the award of summary judgment." Sebastian M., 685 F.3d at 84-85 (citations omitted).

measured against the correct standard, N.S.'s progress under the challenged IEPs was sufficient.

## B.

Johnson first argues that the BSEA hearing officer overlooked her argument that N.S. should be "mainstreamed." In IDEA parlance, "mainstreaming" refers to the law's directive that states must ensure that disabled students are educated in the "least restrictive environment," and particularly that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled . . . ." 20 U.S.C. § 1412(a)(5)(A). The district court declined to entertain this argument, concluding that Johnson did not raise it before the BSEA and so failed to satisfy the IDEA's administrative exhaustion requirement. Johnson, 201 F. Supp. 3d at 205-06.

While conceding that she never used the word "mainstreaming" before the hearing officer, Johnson contends that she implicitly "raised this point in argument and laid the factual predicates onto the record." She emphasizes several statements in her written "closing argument" to the BSEA, such as her statement that "so many students with disabilities like [N.S.] are placed unnecessarily in segregated settings like Horace Mann and [] so few [students] were included with [] typically developing peers." She also points to repeated arguments in that document that N.S. should be educated with an appropriate "peer group," and asks

- 18 -

rhetorically "[w]hat else would a mainstreaming argument look like, other than a peer group argument?"

In our view, Johnson's contention that these statements demonstrate her pursuit of a "mainstreaming" argument is belied by context. Viewed in isolation, phrases like those quoted above might indeed suggest that N.S. should be placed in a class with "children who are not disabled." It is evident, however, that this was not the thrust of Johnson's argument before the hearing officer; rather, she sought out-of-district placement for N.S. with other, similarly disabled students. Her "closing argument" itself makes this clear: following the language quoted above, Johnson urges the conclusion that the READS Collaborative "provid[es] the 'Least Restrictive Environment'" and an appropriate peer group of hearing-impaired students. In other words, Johnson's use of those phrases was not directed at encouraging the BSEA to "mainstream" N.S. into a classroom with hearing students, but only to contrast the student body at READS with that at Horace Mann, which she claimed included students with disabilities other than hearing impairment. This understanding accords with the rest of the record: while Johnson consistently sought placement for N.S. at specialized schools for the hearing-impaired, we find no indication that she ever sought to have him placed with his hearing peers.

- 19 -

Finding as we do that Johnson did not present a "mainstreaming" argument to the BSEA, we have no difficulty concluding it cannot be considered here. "IDEA requires that a plaintiff raise or exhaust claims concerning a disabled child's 'educational situation' in the due process hearing." Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 25 (1st Cir. 2002) (citation omitted).

## C.

Johnson next levels a series of claims based on the conduct of the hearing itself. We examine these in turn.

### i.

Johnson raises a number of challenges to the hearing officer's decision, insisting that the hearing officer impermissibly relied on statements Johnson made at the prehearing conference. Johnson also maintains that the hearing officer demonstrated bias against her by stating at that hearing that Johnson's decision to proceed was a gamble and that she should seriously consider settlement, and that the hearing officer should have recused herself due to that bias.

Johnson first contends that Federal Rule of Evidence 408 (rendering evidence of "Compromise Offers and Negotiations" inadmissible) should be extended to settlement discussions before the hearing officer. Absent an express requirement, however, administrative hearings are not bound by the Federal Rules of

Evidence.  See Fed. Trade Comm'n v. Cement Inst., 333 U.S. 683, 705-06 (1948) ("[A]dministrative agencies . . . have never been restricted by the rigid rules of evidence."); R & B Transp., LLC v. U.S. Dep't of Labor, Admin. Review Bd., 618 F.3d 37, 45 (1st Cir. 2010) (stating that "[t]he Federal Rules of Evidence do not apply in APA proceedings" and applying rules specific to agency in question); see also Fed. R. Evid. 101, 1101 (listing covered proceedings).  The rules governing BSEA hearings explicitly decline to bind due process hearings to "the rules of evidence applicable to courts[.]"  Mass. Dep't of Elementary & Secondary Educ., Hearing Rules for Special Appeals ("Hearing Rules"), Rule X(C).  The assertion that the Federal Rules of Evidence govern BSEA proceedings is thus baseless.[11]

Johnson next argues that these negotiations were protected by the IDEA's exclusion of evidence of "[d]iscussions that occur during the mediation process[.]"  20 U.S.C. § 1415(e)(2)(G); see also 603 Mass. Code Regs. 28.08(4)(b) ("All

---

[11] Johnson also attempts to back-door the Federal Rules of Evidence into the administrative proceedings, arguing that the district court cannot consider evidence of the settlement negotiation in the administrative records.  We find no support for this position.  Moreover, given the record here, we decline to find that the district court erred in reviewing evidence of the settlement discussion that was properly considered by the hearing officer below.  See, e.g., New Dynamics Found. v. United States, 70 Fed. Cl. 782, 797-98 (Fed. Cl. 2006) ("[I]f plaintiff is right, the [agency] would be obliged to apply those same evidence rules derivatively, lest the court strike materials that it relied upon in denying a [claim].").

discussions that occur during mediations are confidential and may not be used as evidence in a hearing."). "Mediation" does not, however, refer to any setting in which the parties discuss settlement in front of a third party, but only negotiations that occur before a designated mediator. See 20 U.S.C. § 1415(e)(2)(A)(iii) (stating that "mediation" must be "conducted by a qualified and impartial mediator who is trained in effective mediation techniques."); 34 C.F.R. § 300.506(b)(iii) (same). Here, the negotiations were before a hearing officer who convened the parties for a prehearing conference. There is no evidence that the parties sought to designate the hearing officer as a "mediator," and the fact that the parties discussed settlement at that conference did not transform it into a mediation.[12] Indeed, the BSEA rules explicitly contemplate the fact that a prehearing

---

[12] While neither the IDEA nor the BSEA rules explicitly prohibit a hearing officer from acting as a mediator, both appear to envision those positions as entirely separate roles. See 603 Mass. Code Regs. 28.08(3) ("Mediations and hearings shall be conducted by impartial mediators and hearing officers who do not have personal or professional interests that would conflict with their objectivity in the hearing or mediation and who are employed to conduct those proceedings."); U.S. Dep't of Educ. Office of Special Educ. and Rehab. Services, OSEP MEMO 13-08, OSEP Memo and Q&A on Dispute Resolution, at 6 (July 23, 2013) (noting that "[t]he mediator, in the case of mediation, and the hearing officer, in the case of a due process hearing, must be a qualified and impartial individual. Aside from these similarities, there are important differences."). We note also that the BSEA claims in its brief that, separate from the due process hearing, Johnson and BPS did in fact participate in a mediation held before a BSEA mediator. The record does not appear to contain any mention of this mediation.

conference might include such discussions. See Hearing Rules, Rule V(B) ("Participants in a prehearing conference must have full authority to settle the case or have immediate access to such authorization."). These same governing BSEA rules do not require that the prehearing conference be confidential. Id. Rule X(C). Simply put, because there was no mediator during the negotiations, there is no basis to place the prehearing conference within the coverage of Section 1415(e)(2)(G).[13]

Lastly, Johnson argues that consideration of these unsworn statements demonstrates impermissible bias and prejudging of facts by the hearing officer. We disagree. At the outset, we do not view the credibility determination, without more, as indicative of "actual bias or hostility" towards Johnson, see Roland M. v. Concord Sch. Comm., 910 F.2d 983, 997-98 (1st Cir. 1990), nor do we find any evidence of such bias elsewhere in the record. Statements by the hearing officer that moving forward with the proceeding entails a risk, and so that settlement may be well-advised, do not evince bias. Likewise, we find no authority for treating an adverse credibility determination based on the witness's conduct before a tribunal as impermissible prejudgment

_____

[13] Johnson's argument regarding the Massachusetts state law governing "mediation privilege" fails for the same reason. Mass. Gen. Laws ch. 233 § 23C (mediator defined as individual who, inter alia, "enters into a written agreement with the parties to assist them in resolving their disputes").

of facts.  The hearing officer's assessment was based on Johnson's statements in this case that were made while the hearing officer was functioning in at least a semi-adjudicative capacity.  In this context, at least, we are hard-pressed to see how consideration of even unsworn statements in a credibility determination constitutes impermissible prejudging of the merits.

## ii.

Johnson separately claims that the hearing officer inappropriately considered her preference for parochial schools in evaluating her credibility.  Johnson contends that this effectively "punished" her preference and violated her First Amendment rights to harbor and express that opinion.

This argument is utterly without merit.  Johnson's bias against public schools was certainly relevant to the hearing officer's determination, as there was reason to believe that Johnson's petition was motivated by a desire to place N.S. in a parochial school, rather than any actual inadequacies in N.S.'s instruction at Horace Mann.  Johnson mischaracterizes this issue as one of credibility, but Johnson's credibility has nothing to do with the ultimate issue of whether N.S. was properly provided with a FAPE.  Nor is there any evidence that Johnson was "punished" for her preference.  The hearing officer did not ultimately rule against Johnson because of her bias against public schools, but

because she found that the quality of N.S.'s education met the standard for a FAPE in the least restrictive setting.

**D.**

In her final challenge, Johnson contends generally that N.S.'s educational progress was not sufficient to provide him with a FAPE. In support of this argument, she contends that the Supreme Court's recent decision in Endrew F., 137 S. Ct. 988, raised the bar for evaluating the adequacy of the IEPs offered to disabled students, such that the case should be remanded to the district court for evaluation under the new standard.

At the outset, we disagree with Johnson's premise that Endrew F. altered the standard to be applied here. In that case, a unanimous Court held that the standard applied below, upholding an IEP so long as it was "calculated to confer an 'educational benefit [that is] merely . . . more than de minimis[,]'" was insufficient to satisfy the substantive requirements of the IDEA. 137 S. Ct. at 997 (quoting Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 798 F.3d 1329, 1338 (10th Cir. 2015)) (first two alterations in original). Instead, the Court concluded that "[t]he IDEA demands . . . . an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 1001.

In our view, the standard applied in this circuit comports with that dictated by Endrew F. This court has announced

that, "to comply with the IDEA, an IEP must be reasonably calculated to confer a meaningful educational benefit," and emphasized that this requires consideration of the individual child's circumstances.[14]  D.B., 675 F.3d at 34 ("An IEP must be 'individually designed' . . . and must include, 'at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward these goals, and the specific services to be offered.'" (internal citations omitted)).  The district court (and the BSEA before it) relied on this standard. See Johnson, 201 F. Supp. 3d at 191-92.  Given the lack of any evident discrepancy between the standard applied in this circuit (and in this case) and that announced by Endrew F., we see no reason to remand the case for further evaluation.

It remains only for us to decide whether, viewed against the record as a whole, the district court's conclusion that the IEPs were adequate was clear error.  See Lessard I, 518 F.3d at 24.  In reaching that determination, the district court canvassed the record and noted the objective indicia of N.S.'s advancement

---

[14] In D.B., this court cited the Second Circuit's standard for evaluating the substance of IEPs to elucidate the requirements imposed by this circuit.  675 F.3d at 34-35 (citing D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2d Cir. 2005)). We note that the Second Circuit recently upheld that standard as consistent with Endrew F.  See Mr. P v. W. Hartford Bd. of Educ., 885 F.3d 735, 757 (2d Cir. 2018).

as he moved from a substantial inability to communicate or understand spoken or signed language to gradually signing, vocalizing, and demonstrating comprehension of other linguistic concepts. That opinion, and the preceding BSEA decision, also noted the consistent recommendation by medical experts and educators that N.S. receive education in both spoken and sign language, with the hearing officer placing particular emphasis on evaluations through this period indicating that N.S.'s communication using sign-supported spoken English considerably outpaced his abilities in spoken English alone. Finally, the district court noted that N.S.'s education at READS, which Johnson approved of, used the same methodologies urged by the challenged IEPs and made available at Horace Mann. Based on these findings, the district court concluded that the challenged plans were sufficient to provide N.S. with a FAPE.

We see no clear error in this determination. The facts in the record are certainly sufficient to support the conclusion that N.S. in fact made meaningful educational progress under the educational methodology proposed by the IEPs and employed in Horace Mann. Evidence from evaluations during this period demonstrate that N.S. made meaningful linguistic advancements, particularly when using both sign and spoken language, and it is reasonable to conclude that an IEP offering a similar program would allow him to continue this development. See D.B., 675 F.3d at 38 (permissible

to conclude that, "since [] previous IEPs had conferred meaningful educational benefits, [a similar future] IEP was reasonably calculated to do the same, having kept in place, and even supplemented, the services offered by previous IEPs."). As the district court correctly noted, this conclusion is further supported by evidence submitted by Johnson showing that N.S.'s linguistic skillset continued to progress at READS while using a "similar methodological model and . . . student-teacher ratio" to that available at Horace Mann. Johnson, 201 F. Supp. 3d at 202.

Johnson fails to point us to any evidence in the record that contradicts the district court's finding, much less any indication that it is unsupportable considering the record as a whole.[15] Instead, she focuses on statements by the BSEA and the district court characterizing N.S.'s progress as "slow" and his linguistic skills as "significantly delayed." To the extent that Johnson implies that "slow" progress is, in and of itself, insufficient to constitute a "meaningful educational benefit," we cannot agree. Instead, the relationship between speed of advancement and the educational benefit must be viewed in light of

---

[15] The only specific facts to which Johnson does point are an apparent regression in N.S.'s language skills between January and October 2014. She does not, however, indicate how this backsliding demonstrates the insufficiency of any of the IEPs. In our view, that evidence is consistent with just the opposite conclusion: N.S.'s regression occurred during the period in which he was not attending Horace Mann and thus not following the proposed IEP covering that period.

a child's individual circumstances.  See Endrew F., 137 S. Ct. at 1001 ("[T]he IDEA demands . . . . an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."); see also Lessard I, 518 F.3d at 29 ("[W]hile the reported progress is modest by most standards, it is reasonable in the context of [the student's] manifold disabilities . . . .").  Like the hearing officer before it, the district court thoroughly reviewed the record and concluded that the speed of N.S.'s advancement under the IEP-proposed educational methodology was appropriate considering, among other factors, his starting point and Johnson's own resistance to educating N.S. in ASL and spoken English.  Again, we see this conclusion as entirely supportable within the record, and so find no basis on which to reverse the district court's conclusion.

## III.

For the reasons set forth above, we affirm the district court's grant of summary judgment.