# United States Court of Appeals
## For the First Circuit

No. 18-1794

C.D., by and through her Parents and Next Friends, M.D. and
P.D.; M.D.; P.D.,

Plaintiffs, Appellants,

v.

NATICK PUBLIC SCHOOL DISTRICT; BUREAU OF SPECIAL EDUCATION
APPEALS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Benjamin J. Wish, with whom Todd & Weld, LLP, Laurie R.
Martucci, and Martucci Law Associates were on brief, for
appellants.
Selene Almazan-Altobelli and Ellen Saideman on brief for
Council of Parent Attorneys and Advocates, Inc., amicus curiae.
Ira A. Burnim, Lewis Bossing, Elizabeth B. McCallum, Paul E.
Poirot, William T. DeVinney, and Baker Hostetler, LLP on brief for
the Judge David L. Bazelon Center for Mental Health Law,
Association of University Centers on Disabilities, Disability Law
Center, National Center for Learning Disabilities, National Center
for Youth Law, National Disability Rights Network, and National
Down Syndrome Congress, amici curiae.
Felicia S. Vasudevan, with whom Murphy, Hesse, Toomey &

Lehane, LLP was on brief, for Natick Public School District.

Anna Rachel Dray-Siegel, Assistant Attorney General, with whom Maura Healey, Attorney General of Massachusetts, was on brief, for Bureau of Special Education Appeals.

Michael J. Long and Long & DiPietro, LLP on brief for the Massachusetts Association of School Superintendents, amicus curiae.

Francisco M. Negrón, Jr., Cristine M.D. Goldman, Colleen Shea, Colby Brunt, and Stoneman, Chandler & Miller, LLP on brief for National School Boards Association and Massachusetts Association of School Committees, amici curiae.

─────────────

May 22, 2019

─────────────

**LYNCH**, **Circuit Judge**.  The Individuals with Disabilities Education Act (IDEA) requires that students with certain disabilities be provided a "[f]ree appropriate public education" (FAPE) in the "[l]east restrictive environment" (LRE) appropriate for each student.  20 U.S.C. § 1412(a)(1), (5).  Under the IDEA and Massachusetts law, the individualized education programs (IEPs) of certain disabled students must also contain postsecondary transition goals and services based on age-appropriate assessments.  Id. § 1414(d)(1)(A)(i)(VIII); Mass. Gen. Laws ch. 71B, § 2.

Appellants are C.D., a resident of Natick, Massachusetts, who qualified as a child with a disability under the IDEA, and her parents.  They challenge this circuit's prior interpretations of these IDEA requirements as incomplete or as inconsistent with the IDEA and current Supreme Court case law.  The parents seek reimbursement for at least three years of C.D.'s education in a specialized private school.  Rejecting these challenges, we affirm the district court, which upheld a decision of the Massachusetts Bureau of Special Education Appeals (BSEA) ruling that the Natick Public School District (Natick) had complied with the FAPE, LRE, and transition requirements in proposed IEPs for C.D.  See C.D. v. Natick Pub. Sch. Dist. (C.D. II), No. 15-13617-FDS, 2018 WL 3510291, at *1 (D. Mass. July 20, 2018); C.D.

v. Natick Pub. Sch. Dist. (C.D. I), No. 15-13617-FDS, 2017 WL 3122654, at *1 (D. Mass. July 21, 2017).

## I.

The IDEA offers states federal funds for the education of children with disabilities in exchange for the states' commitments to comply with the IDEA's directives, including its FAPE and LRE requirements. See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 295 (2006).

A FAPE "comprises 'special education and related services' -- both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 748-49 (2017) (quoting 20 U.S.C. § 1401(9), (26), (29)). "The primary vehicle for delivery of a FAPE is an IEP." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012) (internal quotation marks omitted). IEPs are "comprehensive plan[s]" that are developed by the child's "IEP Team (which includes teachers, school officials, and the child's parents)" and that "must be drafted in compliance with a detailed set of procedures." Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017) (internal quotation marks omitted). Under the Supreme Court's recent decision in Endrew F. v. Douglas County School District RE-1, 137 S. Ct. 988 (2017), the services offered in an IEP amount to a FAPE if they are "reasonably calculated to

enable a child to make progress appropriate in light of the child's circumstances."  Id. at 1001.

The IDEA also requires states receiving federal funds to educate disabled children in the "[l]east restrictive environment" appropriate for each child.  20 U.S.C. § 1412(a)(5).  The statute mandates at § 1412(a)(5)(A):

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Id.  The Supreme Court has characterized this LRE mandate as embodying a "preference" for "mainstreaming" students with disabilities in "the regular classrooms of a public school system." Bd. of Educ. v. Rowley, 458 U.S. 176, 202-03 (1982); see also Endrew F., 137 S. Ct. at 999 ("[T]he IDEA requires that children with disabilities receive education in the regular classroom 'whenever possible'" (quoting Rowley, 458 U.S. at 202)).  But the IDEA's preference for mainstreaming "is not absolute."  T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 162 (2d Cir. 2014); see also Rowley, 458 U.S. at 197 n.21 ("The Act's use of the word 'appropriate' . . . reflect[s] Congress' recognition that some settings simply are not suitable environments for . . . some

- 5 -

handicapped children."). Instead, as we explained in <u>Roland M.</u> v. <u>Concord School Committee</u>, 910 F.2d 983 (1st Cir. 1990), "the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement."[1] <u>Id.</u> at 993.

The final IDEA requirement at issue here is the instruction at § 1414(d)(1)(A)(i)(VIII) that certain students' IEPs "include[] . . . appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and . . . independent living skills" along with "the transition services (including courses of study) needed to assist the child in reaching those goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb). Massachusetts has made these transition requirements applicable starting at age fourteen. <u>See</u> Mass. Gen. Laws ch. 71B, § 2; <u>see also</u> 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) (making this requirement applicable "beginning not later than the first IEP to be in effect when the child is 16"). Because C.D. was fourteen or older when the IEPs at issue were proposed, these requirements applied.

---

[1] <u>Roland M.</u> interpreted the IDEA's predecessor statute, <u>see</u> 910 F.2d at 987, but the text of the provision at issue has not changed, <u>compare</u> Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142 § 612(5), 89 Stat. 733, 781 (1975), <u>with</u> 20 U.S.C. § 1412(a)(5)(A).

- 6 -

C.D. has borderline intellectual functioning and significant deficits in language ability. She attended public school in Natick through fifth grade. For middle school, she attended McAuliffe Regional Charter Public School in Framingham, Massachusetts, where she took all of her classes except math in a regular classroom setting. To assist C.D., two private tutors hired by C.D.'s parents attended C.D.'s middle school classes with her.

The summer before C.D. entered high school, her parents worked with Natick to develop an IEP for C.D.'s ninth grade year at Natick High School. C.D.'s parents wanted C.D. to continue her education in a regular classroom setting, with the help of the same private tutors. School officials explained that only Natick employees were allowed to teach or tutor students in Natick's classrooms.

Natick was concerned that larger class sizes and more advanced content in high school would make it difficult for C.D. to access the general education curriculum. It considered placing C.D. in replacement classes in which a modified general education curriculum is taught by a special education teacher. Ultimately, Natick, in its proposed IEP, chose a third option.

The school presented C.D.'s parents with a proposed ninth grade IEP, for the 2012-2013 school year, that placed C.D.

in regular classrooms for her elective courses but in a setting called the ACCESS Program for her academic courses. The ACCESS Program is a self-contained special education program located at Natick High School and designed for students who, like C.D., have cognitive and communication deficits. ACCESS offers a significantly modified curriculum, and its students typically earn certificates rather than high school diplomas.

C.D.'s parents rejected the IEP, saying that the ACCESS Program was an overly "restricted environment" and that C.D.'s placement there would "hinder" her academic and social growth. They enrolled C.D. at Learning Prep School, a private school that specializes in educating students with disabilities.

The summer before C.D. was to enter tenth grade, Natick presented to C.D.'s parents an IEP for the 2013-2014 school year that again placed C.D. in the ACCESS Program for her academic classes. C.D.'s parents again rejected the IEP, giving the same reasons, and enrolled C.D. at Learning Prep.

Before the next school year, the IEP Team reconvened, this time with the benefit of a fresh set of assessments of C.D. Based on these assessments and on reports of C.D.'s progress at Learning Prep, Natick proposed a new IEP for the 2014-2015 school year that placed C.D. in a mix of ACCESS classes, replacement classes, and general education classes. C.D.'s parents rejected this IEP for two reasons. As they saw it, the proposed schedule

left inadequate time for speech and language services. In addition, Natick had not yet conducted a formal postsecondary transition assessment. As to C.D.'s postsecondary transition, the 2012-2013, 2013-2014, and initial 2014-2015 IEPs had stated the parents' goal that C.D. graduate from high school and had provided transition and vocational services from the school's learning center.

Natick then performed a formal transition assessment and presented a revised 2014-2015 IEP. This final IEP proposed the same mix of classes, but extended C.D.'s school day to allow for speech and language therapy as well as career preparation services. C.D.'s parents rejected this IEP, and C.D. attended Learning Prep for the 2014-2015 school year.

In 2014, C.D.'s parents filed a complaint with the BSEA seeking reimbursement for C.D.'s tuition at Learning Prep. To qualify for reimbursement, the parents had to show that Natick's IEPs for 2012-2013, 2013-2014, and 2014-2015 "had not made a free appropriate public education available."[2] See 20 U.S.C. § 1412(a)(10)(C)(ii). After a hearing in May 2015, a BSEA Hearing

_____

[2] The transition planning and transition assessment requirements are procedural. Only certain procedural flaws, such as those that result in the denial of a FAPE or "a deprivation of educational benefits," are actionable under the IDEA. 20 U.S.C. § 1415(f)(3)(E)(ii); see also, e.g., R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 195 (2d Cir. 2012) (applying this harmless error principle to a claimed violation of the transition requirements).

Officer denied the parents' request for reimbursement. The Hearing Officer concluded that the IEPs were "reasonably calculated to provide [C.D.] with a free appropriate public education in the least restrictive environment." And the Hearing Officer found that the facts and testimony presented did not support the parents' arguments that the transition assessments and plans were inadequate.[3]

C.D.'s parents sought review of the BSEA's decision in federal district court. The district court denied the parents' motion for summary judgment and their supplemental motion for summary judgment. See C.D. I, 2017 WL 3122654, at *26; C.D. II, 2018 WL 3510291, at *4. Giving "due weight" to the decision of the BSEA, C.D. I, 2017 WL 3122654, at *15, the district court made three relevant rulings. First, because Endrew F. had been decided while the parents' motion for summary judgment was pending, the district court verified that the Hearing Officer had applied a FAPE standard consistent with Endrew F.[4] Id. at *16 ("[T]he standard articulated in Endrew F. is not materially different from the standard set forth in" the First Circuit's prior cases and "applied by the hearing officer."). Second, the district court

---

[3] The Hearing Officer also rejected other arguments not presented on appeal.

[4] The district court first remanded in part to the BSEA for the Hearing Officer to confirm that she had applied a standard consistent with Endrew F.

- 10 -

found it "unclear" whether the BSEA's decision had followed the First Circuit's prior cases on the LRE mandate. Id. at *19. And so the district court remanded to the BSEA to determine whether the 2012-2013 and 2013-2014 IEPs, which proposed to place C.D. in the ACCESS Program for her academic courses, had provided a FAPE in the LRE. After the BSEA responded with a clarification order, the district court concluded that "based on the preponderance of the evidence, the BSEA hearing officer appropriately found that the district balanced the benefits of mainstreaming against the restrictions associated with the [ACCESS] classes, and that the . . . IEPs were reasonably calculated to provide a FAPE in the least restrictive environment possible." C.D. II, 2018 WL 3510291, at *4. Third, the district court agreed with the BSEA that the 2012-2013, 2013-2014, and the final 2014-2015[5] IEPs complied with the IDEA's transition planning and assessment requirements. C.D. I, 2017 WL 3122654, at *19, *21.

### III.

C.D.'s parents now argue that the district court applied the wrong legal standards. They say first that Endrew F. defined "progress appropriate" as "appropriately ambitious" and "challenging" so that the district court was required to ask, in

---

[5] The district court held that any challenges to the initial 2014-2015 IEP were mooted by that IEP's replacement with the final 2014-2015 IEP. C.D. I, 2017 WL 3122654, at *21.

evaluating whether a FAPE was offered, whether the IEPs contained sufficiently "challenging objectives." Endrew F., 137 S. Ct. at 1000. Next, the parents urge us to adopt, and contend that the district court should have applied, a multi-part test from Daniel R.R. v. State Board of Education, 874 F.2d 1036 (5th Cir. 1989), to evaluate whether the IEPs placed C.D. in an overly restrictive environment. Finally, C.D.'s parents argue that the district court ignored the plain language of the IDEA's transition planning and assessment requirements.

Our review of the district court on these legal issues is de novo. See Johnson v. Bos. Pub. Sch., 906 F.3d 182, 191 (1st Cir. 2018). We hold that the district court properly applied this circuit's standards and that those standards are consistent with Endrew F. and with the IDEA. The parents also raise alternative arguments that the district court erred in applying law to fact, and we review these fact-dominated rulings deferentially. Id. (quoting Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 76 (1st Cir. 2016)). Finding no errors, we affirm.

A.

Until Endrew F., the Supreme Court had "declined . . . to endorse any one standard for determining" whether the services offered in a student's IEP amounted to a FAPE. Endrew F., 137 S. Ct. at 993. This circuit, along with several others, said that to offer a FAPE, an IEP must be "individually

- 12 -

designed" and "reasonably calculated to confer a meaningful educational benefit." D.B., 675 F.3d at 34-35 (citing D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010), then citing D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2d Cir. 2005), and then citing Deal v. Hamilton Cty. Bd. of Educ., 392 F.3d 840, 862 (6th Cir. 2004)). After Endrew F., this court confirmed, in Johnson v. Boston Public Schools, 906 F.3d 182 (1st Cir. 2018), that this "meaningful educational benefit" standard for evaluating whether an IEP offers a FAPE "comports" with the standard "dictated by Endrew F."[6] Id. at 194-95.

C.D.'s parents say that our Johnson decision restricted its view to Endrew F.'s language about "progress appropriate in light of the child's circumstances," Endrew F., 137 S. Ct. at 1001, and that we have yet to examine language in Endrew F. about "ambitious" and "challenging" goals, id. at 1000. On the parents' reading, after Endrew F., courts must ask not only whether an IEP offers meaningful educational progress, but also, separately, whether the IEP's objectives are ambitious and challenging.

---

[6]     Other circuits that use a "meaningful benefit" standard have held the same. See L.H. v. Hamilton Cty. Dep't of Educ., 900 F.3d 779, 792 n.5 (6th Cir. 2018); Mr. P. v. W. Hartford Bd. of Educ., 885 F.3d 735, 757 (2d Cir.), cert. denied sub nom. Mr. P. v. W. Hartford Bd. of Educ., 139 S. Ct. 322 (2018); K.D. ex rel. Dunn v. Downingtown Area Sch. Dist., 904 F.3d 248, 254 (3d Cir. 2018).

The parents misread Endrew F., which did not construe the FAPE standard as two independent tests. That decision's core holding was that the "merely more than de minimis" educational benefit standard that had been used by the appellate court to evaluate Endrew's IEPs was insufficiently "demanding." Id. at 1000-01; see also id. at 997 (quoting Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 798 F.3d 1329, 1338 (10th Cir. 2015)). Endrew F. defined a FAPE -- "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," id. at 1001 -- in contrast to this rejected, "de minimis" standard. It was in this context that the Supreme Court employed the terms "ambitious" and "challenging." The Court explained that, for many children with disabilities integrated into "the regular classroom," an "appropriately ambitious" goal is "advancement from grade to grade." Id. at 1000. And the Court stated that, for those "not fully integrated in the regular classroom," the particular "goals may differ, but every child should have the chance to meet challenging objectives." Id. In short, Endrew F. used terms like "demanding," "challenging," and "ambitious" to define "progress appropriate in light of the child's circumstances," not to announce a separate dimension of the FAPE requirement. Id. at 1000-01; cf. R.F. v. Cecil Cty. Pub. Sch.,

919 F.3d 237, 252 (4th Cir. 2019) (defining adequate progress and "challenging objectives" under Endrew F.).

Under both Endrew F. and our precedent, a court evaluating whether an IEP offers a FAPE must determine whether the IEP was reasonably calculated to confer a meaningful educational benefit in light of the child's circumstances. See Johnson, 906 F.3d at 195; cf. K.D. ex rel. Dunn v. Downingtown Area Sch. Dist., 904 F.3d 248, 256 (3d Cir. 2018) (equating meaningful progress and challenging objectives). Depending on context, determining whether an IEP is reasonably calculated to offer meaningful progress may or may not require a sub-inquiry into how challenging the plan is. Here, the district court did just what Endrew F. and Johnson require in affirming the BSEA's conclusion that the 2012-2013 and 2013-2014 IEPs offered a FAPE.[7] See C.D. I, 2017 WL 3122654, at *16 (describing the standard applied by the BSEA); C.D. II, 2018 WL 3510291, at *4 (affirming the BSEA's FAPE conclusion).

The district court also did not err in applying that standard to the facts in the record. The parents maintain that C.D. would not have made appropriate progress in the ACCESS Program, but the district court reasonably concluded that the

---

[7] C.D.'s parents argue that, in evaluating the 2012-2013 and 2013-2014 IEPs, the BSEA misapplied the First Circuit's FAPE standard by omitting the word "meaningful" from its analysis. But the BSEA did not overlook that operative word.

- 15 -

record supported the BSEA's finding that C.D., given her diagnosed intellectual disability and serious language deficits, could be expected to make meaningful progress in the ACCESS program and general education electives. See C.D. II, 2018 WL 3510291, at *3-4.

B.

C.D.'s parents argue next that the 2012-2013 and 2013-2014 IEPs violated the LRE mandate by proposing to place C.D. in the ACCESS Program, which the parents view as overly restrictive. They urge us to adopt, and argue that the district court should have applied, the multi-step test from the Fifth Circuit's decision in Daniel R.R. to evaluate this claim.[8] See 874 F.2d at 1048-50. We reject both arguments. Instead, we affirm the district court, which properly relied on our decision in Roland M. in ruling that the IEPs did not violate the LRE mandate.

Courts that use the Daniel R.R. methodology evaluate compliance with the LRE mandate in two steps, asking first "whether education in the regular classroom, with the use of supplementary

---

[8]    Natick and the BSEA argue that C.D.'s parents waived their argument based on Daniel R.R. by neglecting to "set forth [its] multifactor test" before the district court. But we deem sufficient the parents' reliance on Daniel R.R. in the district court; the parents' motions cited to and the district court quoted from Daniel R.R. See C.D. II, 2018 WL 3510291, at *3; see also Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) (finding no waiver where "the district court was not left . . . to ferret out an evanescent needle from an outsized paper haystack").

- 16 -

aids and services, can be achieved satisfactorily," and, if the child cannot be educated in the regular classroom, asking second "whether the school has mainstreamed the child to the maximum extent appropriate." Id. at 1048. In answering the first question, Daniel R.R. instructs courts to consider whether the district has made reasonable efforts to accommodate the child in a regular classroom; the benefits, both academic and non-academic, available to the child in a regular class compared to the benefits, both academic and non-academic, available in a more restricted class; and the effects of inclusion on other children in the regular classroom. Id. at 1048-49; see also Oberti by Oberti v. Bd. of Educ., 995 F.2d 1204, 1217-18 (3d Cir. 1993).

The parents frame their claim as presenting the following question, which they say is one of first impression in this circuit: When does a school's decision to educate a child with disabilities in a setting other than the regular classroom violate the IDEA's LRE mandate? Several other circuits, the parents observe, have used the Daniel R.R. test to evaluate parents' claims that their children should be mainstreamed.[9] See

---

[9] The Fourth and Eighth Circuits have applied the Sixth Circuit's test from Roncker v. Walter, 700 F.2d 1058 (6th Cir. 1983), which asks "whether the services which make . . . [an alternative] placement superior could be feasibly provided in a non-segregated setting." Id. at 1063; see also DeVries v. Fairfax Cty. Sch. Bd., 882 F.2d 876, 878-79 (4th Cir. 1989); A.W. v. Nw. R-1 Sch. Dist., 813 F.2d 158, 163 (8th Cir. 1987).

Oberti, 995 F.2d at 1216-17; T.M., 752 F.3d at 161-62; L.B. ex rel. K.B. v. Nebo Sch. Dist., 379 F.3d 966, 976-77 (10th Cir. 2004); Sacramento City Unified Sch. Dist. v. Rachel H. ex rel. Holland, 14 F.3d 1398, 1400-01 (9th Cir. 1994). The parents' premise is incorrect. There is no ground for distinguishing our prior cases, like Roland M., involving parents who sought a more restrictive placement than the one proposed in the IEP.[10] Those cases and this one in fact present the same question: Did the IEP's proposed placement violate the IDEA's LRE mandate?

The text of § 1412(a)(5)(A) and prior precedent provide the guidance we need to evaluate whether Natick complied with the LRE mandate here. In eschewing the Daniel R.R. test because "[t]he Act itself provides enough of a framework," we join the Seventh Circuit. See Beth B. v. Van Clay, 282 F.3d 493, 499 (7th Cir. 2002) (declining to adopt the Daniel R.R. test).

C.D.'s parents argue that the Daniel R.R. test adds needed "complexity" to the statute's terms. But determining an appropriate placement for a disabled child is already a complex task. It is one that "involves choices among educational policies and theories -- choices which courts, relatively speaking, are

---

[10] See, e.g., C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 287 (1st Cir. 2008) (holding that the district court "supportably concluded" that public school day placement rather than residential placement requested by parents was least restrictive environment appropriate); Roland M., 910 F.2d at 993; Abrahamson v. Hershman, 701 F.2d 223, 229-30 (1st Cir. 1983).

- 18 -

poorly equipped to make." Roland M., 910 F.2d at 992; see also C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 289 (1st Cir. 2008) (acknowledging "the truism that courts should recognize the expertise of educators with respect to the efficacy of educational programs"). That is why the IDEA "vests" state and school "officials with responsibility for" choosing a child's placement. Endrew F., 137 S. Ct. at 1001. And it is why courts owe respect and deference to the expert decisions of school officials and state administrative boards. See Lessard v. Wilton-Lyndenborough Coop. Sch. Dist. (Lessard II), 592 F.3d 267, 270 (1st Cir. 2010) ("The standard of review is thus deferential to the educational authorities, who have 'primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs.'" (quoting Rowley, 458 U.S. at 207)). There is no need to add complexity to the LRE mandate in the form of Daniel R.R.'s judicial gloss, and every reason not to do so.

We proceed to review the district court's decision under § 1412(a)(5)(A) and our cases interpreting it. Again, the IDEA mandates, at § 1412(a)(5)(A):

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a

child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). Our cases have "weighed" this preference for mainstreaming "in concert with the" FAPE mandate. Roland M., 910 F.2d at 992-93. The two requirements "operate in tandem to create a continuum" of possible educational environments, each offering a different mix of benefits (and costs) for a student's academic, as well as social and emotional, progress.[11] Id. For schools, complying with the two mandates means evaluating potential placements' "marginal benefits" and costs and choosing a placement that strikes an appropriate balance between the restrictiveness of the placement and educational progress. Id.; see also Amann v. Stow Sch. Sys., 982 F.2d 644, 650 (1st Cir. 1992) (per curiam) (phrasing the question as whether the "IEP 'reasonably calculated' the balance between academic progress and" restrictiveness).

The district court correctly identified this legal framework. Quoting Roland M., the district court explained that "'[m]ainstreaming may not be ignored, even to fulfill substantive educational criteria.' Rather, the benefits to be gained from

---

[11] We have recognized that educating students with disabilities with their nondisabled peers can have benefits for disabled students' social and communication skills. See Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1090 & n.7 (1st Cir. 1993) (citing Oberti, 995 F.2d at 1216-17).

- 20 -

mainstreaming must be weighed against the educational improvements that could be attained in a more restrictive (that is, non-mainstream) environment."[12]  C.D. II, 2018 WL 3510291, at *3 (internal citation omitted) (quoting Roland M., 910 F.2d at 993)).

The parents argue, again relying on applications of Daniel R.R., that the district court erred in failing to ask whether C.D. could have been educated in the regular classroom considering "the whole range of supplemental aids and services." Oberti, 995 F.2d at 1216.  The record belies this contention.  The district court here verified that Natick and the BSEA had considered "the nature and severity" of C.D.'s disability as well as the impact of "supplementary aids and services."  20 U.S.C. § 1412(a)(5)(A).  It noted that the BSEA and Natick had both examined three potential placements: the regular classroom, replacement classes, and the ACCESS Program.  C.D. II, 2018 WL 3510291, at *3.  Then the district court found that evidence supported the BSEA's and Natick's conclusion that the ACCESS Program was appropriate because of C.D.'s particular disability -- an "intellectual disability in conjunction with

---

[12]  The parents argue that the district court "erred where it did not even articulate the need to balance non-academic benefits against the putative academic advantages of a substantially separate classroom."  But the district court properly understood the balancing inquiry outlined in Roland M.

weaknesses in receptive and expressive language."[13]  Id. (internal quotation marks omitted).

We see no error in the district court's appropriately deferential analysis.  As we have emphasized, the IDEA vests state and local educational officials, not federal courts, with the primary responsibility to make placement decisions consistent with § 1412(a)(5)(A).

C.

C.D.'s parents next argue that the district court ignored the plain language of the IDEA in affirming the BSEA's ruling that the IEPs complied with the statute's transition provision.  Not so.

We have previously held that the IDEA "does not require a stand-alone transition plan."  Lessard v. Wilton Lyndeborough Coop. Sch. Dist. (Lessard I), 518 F.3d 18, 24 (1st Cir. 2008). Nor does the statute require that the underlying transition assessments take a particular form.  See 20 U.S.C. § 1414(d)(1)(A)(i)(VIII).  Indeed, there is no restriction on the means of gathering information about a student's interests or abilities that may be relevant to the development of postsecondary transition goals.  See, e.g., Mass. Dep't of Elementary &

_____

[13]  C.D.'s parents' dispute of a related factual finding made by the BSEA in its initial ruling on the LRE issue is misplaced.  The district court ultimately reviewed the facts as clarified by the BSEA.

Secondary Educ., Transitional Assessment in the Secondary Transition Planning Process, Technical Advisory SPED 2014-4, at 1-3 (Apr. 9, 2014) (declining to adopt 'a restrictive approach which might seem to imply the required use of highly specialized formal assessments for each student").

The district court did not err in articulating or applying these transition requirements. It discussed the statute's assessment and planning dimensions, it cited repeatedly to Massachusetts' guidance implementing the federal provision, and it relied on case law correctly applying the transition requirement. See C.D. I, 2017 WL 3122654, at *19, *21 (citing Sebastian M. v. King Philip Reg'l Sch. Dist., 774 F. Supp. 2d 393, 407 (D. Mass. 2011), aff'd, 685 F.3d 79 (1st Cir. 2012)).

The district court then reasonably applied those rules in affirming the BSEA's ruling. The IEPs stated grade-appropriate goals and services designed to prepare C.D. for the post-secondary transition.[14] See Lessard I, 518 F.3d at 25; see also, e.g.,

---

[14] Specifically, C.D.'s 2012-2013 IEP stated that C.D.'s parents hoped she would receive a high school diploma and vocational training. The IEP outlined educational goals and services that would have helped C.D. make progress toward that diploma, and it also provided for vocational services from the school's learning center. The 2013-2014 IEP was similar, and it added opportunities to meet with the school's guidance counselor and career specialist to discuss post-secondary plans. The final 2014-2015 IEP further proposed educational and vocational services and set out specific goals related to job readiness, job coaching, and independent living.

Rodrigues v. Fort Lee Bd. of Educ., 458 F. App'x 124, 128 (3d Cir. 2011) (finding adequate an IEP that listed a transition goal and noted available services).  And the 2012-2013 and 2013-2014 plans reflected and were developed based on a transition-specific discussion at the 2012-2013 IEP meeting and on extensive educational and psychological evaluations done of C.D. and provided to Natick as part of the IEP development process.  The final 2014-2015 IEP reflected and was based on assessments like these as well as a formal transition assessment.  All three IEPs contained "appropriate measurable postsecondary goals based upon age appropriate assessments."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa).

IV.

Affirmed.

- 24 -