# United States Court of Appeals
## For the First Circuit

Nos. 21-1882, 21-1887

FALMOUTH SCHOOL DEPARTMENT,

Plaintiff, Counter-Defendant, Appellant, Cross-Appellee,

v.

MR. AND MRS. DOE, on their own behalf and on behalf of their
minor son, JOHN DOE,

Defendants, Counter-Plaintiffs, Appellees, Cross-Appellants,

GENE KUCINKAS,

Counter-Defendant, Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Eric R. Herlan, with whom Drummond Woodsum & MacMahon was on
brief, for appellant and cross-appellees.
Richard L. O'Meara, with whom Murray, Plumb & Murray was on
brief, for appellees.

August 9, 2022

BARRON, **Chief Judge**.  The Falmouth School Department ("Falmouth") appeals from an order of the United States District Court for the District of Maine that concerns the Individuals with Disabilities Education Act (the "IDEA").  The order rejects a challenge to a ruling by a Maine Department of Education due process hearing officer (the "hearing officer") that Falmouth violated the IDEA and that Falmouth was therefore required to reimburse Mr. and Mrs. Doe (the "Does"), the appellees here, for the cost of their son John's tuition at a private school in which they had placed him.  Separately, the Does bring a cross-appeal that challenges the District Court's order that dismisses their counterclaims in Falmouth's IDEA action, which the Does bring against Falmouth under the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act (the "RHA"), and against Gene Kucinkas, Falmouth's Director of Special Education, under 42 U.S.C. § 1983.  We affirm.

## I.

### A.

To receive federal funds under the IDEA, states are generally required to make a "free appropriate public education" (a "FAPE") "available to all children with disabilities residing in the State."  20 U.S.C. § 1412(a)(1)(A).  Maine has accepted funds under the IDEA and required local educational agencies such

as Falmouth to provide a FAPE to eligible children within their jurisdictions. Me. Stat. tit. 20A, §§ 7006, 7202.

"[T]he centerpiece of the [IDEA's] education delivery system for disabled children" is the Individualized Education Program ("IEP"). Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)). The child's "IEP team" develops the IEP, which is "a written statement for each child with a disability" that must, among other requirements, detail the child's academic achievement and functional performance, provide measurable annual goals for the child, describe how the child's progress towards those goals will be measured, and describe what services the child will receive. 20 U.S.C. § 1414(d)(1)(A). The "IEP team" that develops the IEP must include the child's parents, their regular and special education teachers, and a "representative of the local education agency." Id. § 1414(d)(1)(B), (d)(3), (d)(4).

An IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 999. An IEP must also ensure that the child is educated "in the '[l]east restrictive environment' appropriate for" that child. C.D. ex rel. M.D. v. Natick Pub. Sch. Dist., 924 F.3d 621, 625 (1st Cir. 2019) (alteration in original) (quoting 20 U.S.C. § 1412(a)(5)).

The "least restrictive environment" ("LRE") requirement "embod[ies] a 'preference' for 'mainstreaming' students with disabilities in 'the regular classrooms of a public school system.'" Id. (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 202-03 (1982)). The IEP team, in designing an IEP to ensure that the child receives a FAPE, must "choos[e] a placement" in which the child will receive educational instruction "that strikes an appropriate balance between the restrictiveness of the placement and educational progress." Id. at 631. Under our precedent, we "'weigh[]' this preference for mainstreaming 'in concert with the' FAPE mandate." Id. (quoting Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992-93 (1st Cir. 1990)).

If the parents of a child who is eligible to receive services under the IDEA believe that the child has been denied a FAPE, then they may bring a complaint to a state or local educational agency, as determined by the law of the relevant state. 20 U.S.C. § 1415(f)(1)(A); see also G.D. ex rel. Jeffrey D. v. Swampscott Pub. Schs., 27 F.4th 1, 5 (1st Cir. 2022). If the complaint is not resolved informally, the parents are entitled to a "due process hearing" in front of that agency at which their complaint can be adjudicated. 20 U.S.C. § 1415(f)(1)(B). Maine provides that such due process hearings occur in front of a hearing

officer appointed by the Maine Commissioner of Education. Me. Stat. tit. 20-A, § 7207-B(2)(A); see also id. § 1(4).

Under the IDEA, "[a]ny party aggrieved by the findings and decision made" in the administrative proceeding before the state or local educational agency may bring a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A). A District Court that entertains such a civil action must undertake what we have called "'involved oversight' of the agency's factual findings and conclusions." G.D., 27 F.4th at 6 (quoting S. Kingstown Sch. Comm. v. Joanna S., 773 F.3d 344, 349 (1st Cir. 2014)). A District Court that conducts this oversight must review the administrative record and, at the request of a party to the action, additional evidence, while "accord[ing] 'due weight' to the agency's administrative proceedings." Id. (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993)); see also 20 U.S.C. § 1415(i)(2)(C).

The District Court must base its decision on "the preponderance of the evidence" and "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). That relief may, in some circumstances, include a requirement to reimburse parents who "unilaterally change their child's placement during the pendency of review proceedings" to a private placement for the costs that the parents incur for that placement. Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 15 (1993).

**B.**

We describe "the background facts as supportably found by the district court," Sebastian M. v. King Philip Reg'l Sch. Dist., 685 F.3d 79, 82 (1st Cir. 2012); see Falmouth Sch. Dep't v. Doe, No. 20-cv-00214, 2021 WL 4476939 (D. Me. Sept. 29, 2021). We focus here on the facts that pertain to Falmouth's appeal of the District Court's rejection of Falmouth's challenge to the hearing officer's decision that Falmouth denied John a FAPE and the hearing officer's determination that, in consequence, Falmouth must reimburse the Does for the cost that they incurred by placing John in a private school. In Part V, infra, we recount the allegations that are relevant to the Does' cross-appeal of the District Court's order that dismissed their counterclaims.

The hearing officer found that John had been denied a FAPE during two periods: January 2018 to March 2019, and September 2019 to February 2020. Those months span a period in which Falmouth had proposed four separate IEPs for John. We will refer to these IEPs as the January 2018 IEP, the January 2019 IEP, the September 2019 IEP, and the November 2019 IEP.

Before turning to the facts that concern those periods of time and those IEPs, however, we first review the events from an even earlier period. That is the period during which John received services from Falmouth for the first time under an IEP. That initial IEP is not at issue in the IDEA suit that underlies

- 6 -

this appeal, but it provides useful context for our consideration of the IEPs that are. We will refer to this first IEP as the January 2017 IEP.

**1.**

John enrolled at Falmouth Elementary School for first grade in the fall of 2016. He did so after having attended a private preschool and kindergarten. Soon after, Falmouth became aware that John's literacy skills were "at the pre-K level." And then, in November, Falmouth convened an IEP team and the Does consented to John receiving special education services from Falmouth. The January 2017 IEP for John followed thereafter.

According to Robin Seeker, John's special education teacher, when John started this specialized instruction under this IEP, in late January 2017, he was a "nonreader." More specifically, he was reading at or below instructional level A on the Benchmark Assessment System (the "BAS"), which classifies students based on their ability to read independently and with the support of an instructor.

Level A is the lowest level on the BAS. A child meets progress expectations under the BAS if the child is at level D at the end of kindergarten or the beginning of first grade and if the child is at level J by the end of first grade.

The January 2017 IEP included a goal that John would reach instructional level D on the BAS by February 2018, which is

a level that corresponds to "an end of kindergarten reading level." This IEP provided that John would receive ninety minutes of daily instruction from Seeker, with that time split evenly between reading, writing, and math.

The reading instruction that John received while this IEP was in place was initially based on the Wilson "Fundations" program. However, Seeker soon began using the "SPIRE" program instead.

Falmouth and the Does agreed to amend the January 2017 IEP in April 2017 to add summer programming. Following a psychological evaluation that diagnosed John with ADHD, the IEP team met again in May 2017 to review the evaluation. Notes from that meeting indicate that John was "reading at the instructional level C on the [BAS]" and "working on learning his basic sight words," which the hearing officer defined as words "that 'can't be sounded out.'"

**2.**

The January 2017 IEP was set to expire in late January 2018. By that time, John had completed approximately half of second grade. He was still "reading instructional levels C and D books," and "writing at an end of kindergarten level." John had increased, however, to spelling 50 words on a list of 100 "high frequency sight words."

In January 2018, Seeker identified John's "biggest challenge" as being "in the orthographic area." Seeker was referring to orthographic processing, which the District Court explained "refers to the skills necessary 'to store and recall the visual forms of letters and words.'" John also "struggled with . . . phonological processing," which "refers to 'the ability to perceive, order and manipulate the sounds within words.'"

John's IEP team met on January 23, 2018 to revise John's January 2017 IEP. The result was the January 2018 IEP.

This IEP increased the amount of daily specialized instruction that John would receive in reading and writing from thirty minutes each to one hour of reading and forty-five minutes of writing. It did not change, however, the type of reading instruction that John would receive; it continued to provide for John to receive SPIRE programming.

The January 2018 IEP also did not include a specific BAS level as a measurable goal. The IEP did define as a goal, however, that John be able to read the list of 100 "high frequency sight words" that was mentioned above with 70% accuracy by February 2019.

By June 2018, John was still reading "somewhere between a BAS level C and D." He had progressed to the second level of the SPIRE program, but he had taken longer to complete the first level than any other student Seeker could recall. John could spell 56 out of the 100 listed "high frequency sight words."

That summer, Falmouth again offered John summer programming. However, the Does declined the offer and elected to have John tutored at the Children's Dyslexia Center during the summer.

When John began third grade in fall 2018, John's mother emailed his new special education teacher, Karen Dunn, to express concern about John's lack of progress and to ask about other potential programming options. Dunn, too, was concerned about John's lack of progress and had observed "some apparent regression in his reading skills" over the summer.

Dunn shared those concerns with Kucinkas, Falmouth's Director of Special Education. Kucinkas proposed using Lindamood Bell ("LMB") programming, which is, like SPIRE, a reading instruction methodology. LMB programming includes the "Lindamood Phoneme Processing System" ("LiPS") and "Seeing Stars." This proposal was not communicated to the Does.

At a meeting of John's IEP team in September 2018, John's mother raised the concerns that she had raised to Kucinkas. No one on the IEP team, however, suggested any alternative reading programming for John apart from SPIRE. Nonetheless, the January 2018 IEP was amended at that meeting to add the use of audio books to the services that he would receive.

When John returned to school for third grade, Dunn used Wilson "Fundations" materials in instructing John, although the

use of these materials to instruct John was not expressly referenced in the January 2018 IEP.  Dunn used them to address John's apparent reading regression over the summer.

Later in the fall, however, Dunn switched back to using SPIRE to instruct John.  By November, John had mastered only twelve new sight words.

Approximately two and a half months before the January 2018 IEP expired, the Does obtained, on December 9, 2018, a private reading evaluation from Lisa Murphy and Barbara Melnick of the Aucocisco School, which is a private special education school in Maine.  The evaluation "suggested that John . . . struggled with both orthographic processing and phonological processing" and "assessed some core reading skills to be at the 'pre-k to kindergarten levels.'"

The evaluation recommended "intensive and one on one" "intervention."  The evaluation specifically recommended "[t]he Lindamood-Bell curriculum of LiPS followed by/overlaid with the Seeing Stars Program" to better enable John to make progress.

The Does provided this evaluation to Falmouth in January 2019, before the January 2018 IEP had expired.  By then, John had added only three more sight words and progressed only to "BAS instructional level E (early first grade)."

**3.**

John's IEP team reconvened for his second annual review in January 2019. The Does submitted a statement of concern in advance that discussed what they referred to as the "substantial unrecognized orthographic processing deficits" that John had according to the Aucocisco evaluation. They asked that John's reading instruction include the "Lindamood-Bell curriculum of [LiPS] followed by/overlaid with the Seeing Stars Program," based on the Aucocisco evaluation.

Falmouth thereafter proposed the January 2019 IEP. The January 2019 IEP increased the time John would spend in specialized programming at Falmouth Elementary School, such that he would spend 59% of his time in a regular classroom (as opposed to the 63% he had spent in the second IEP year and 77% in his first IEP year). The January 2019 IEP also included "some instruction using the Lindamood Bell Seeing Stars program."

Under the January 2019 IEP, John would receive nine hours of weekly instruction using the Seeing Stars methodology delivered by Shar Mahoney, who had not previously taught John. Mahoney would consult with a trainer certified in LMB programming every other week for fifty minutes. Falmouth reintroduced a BAS goal for John, namely that John achieve BAS level I-J by February 2020.

At the January 22 meeting of the IEP team and in a letter sent two days later, the Does stated that they would remove John

from Falmouth Elementary School each afternoon so that he could receive intensive reading programming at Aucocisco using LiPS and Seeing Stars. Aucocisco proposed to provide John one-on-one instruction for two hours daily.

In the email enclosing the letter, the Does requested that Falmouth adjust John's schedule so that he could remain in his mainstream classroom during the mornings while he was receiving instruction at Falmouth before leaving to receive instruction at Aucocisco in the afternoons. Kucinkas responded in a letter that Falmouth would continue to provide John with specialized instruction during his mornings at Falmouth Elementary School, with no change in light of his daily early dismissal.

**4.**

The Does revoked their consent for services under John's January 2019 IEP on March 12, 2019. They requested a plan for accommodations under Section 504 of the RHA.[1]

Falmouth implemented such a plan (a "504 plan") later that month. John continued to spend his mornings in a mainstream Falmouth Elementary classroom and his afternoons at Aucocisco. John also received a daily hour of tutoring from Aucocisco staff for three weeks during the summer.

---

[1] A plan offered under Section 504 of the Rehabilitation Act provides accommodations for students with disabilities to participate in public school education but does not provide specialized instruction.

- 13 -

John received several evaluations and assessments during the spring and summer of 2019. These included a neuropsychological evaluation performed by Dr. Marcia Hunter in February and March 2019 that recommended LMB programming; multiple assessments that Falmouth proposed and to which the Does consented in June; an evaluation by Aucocisco in July to determine John's progress after 100 hours of Seeing Stars instruction; and a reading evaluation in August by Dr. Jayne Boulos, to whom Falmouth had referred the Does.

The evaluation of John by Aucocisco concluded that he was still reading at a first-grade level but noted gains in his ability to read sight words. Dr. Boulos's evaluation concluded that John's reading skills were "well-below average . . . across all core domains" and recommended another evaluation from the Children's Dyslexia Center, where John had received tutoring the previous summer.

**5.**

John began fourth grade in fall 2019 and continued to split his school days between Falmouth Elementary School and Aucocisco. He was not then receiving services under the IDEA from Falmouth.

Falmouth and the Does continued to discuss restarting those services. Falmouth proposed a new IEP that would increase John's weekly literacy instruction, but Falmouth indicated that it

would not offer any LMB programming in the new IEP. We will refer to this IEP as the September 2019 IEP.

In October 2019, Falmouth assessed John to be at BAS instructional level E, an early first grade reading level and the same level that he had achieved as of January 2019. A math assessment showed that John had below-grade-level math skills.

In November 2019, John's IEP team met again. The Does, in advance of this meeting, communicated to Falmouth that John required a full-day placement at Aucocisco and that Aucocisco's instruction was helping John develop literacy skills. Falmouth proposed an updated IEP that would increase the proposed special education in math and add behavioral intervention efforts but would not offer any LMB programming. We will refer to this IEP as the November 2019 IEP.

The Does rejected the proposed IEP and placed John at Aucocisco full-time starting on November 4, 2019. Then Falmouth proposed a new IEP in February 2020 -- the February 2020 IEP -- that the Does do not challenge.

In March 2020, according to Melnick, the Aucocisco director, John was reading at a mid-second grade to early third grade level. In fall 2020, John's report card noted that he was practicing reading at a third-grade level.

C.

The Does submitted a hearing request to the Maine Department of Education on January 15, 2020.[2]  They argued that John had not been provided a FAPE from January 2018 until February 2020, with the exception of the period from March 2019 to the start of John's fourth grade year that fall when he was not receiving services under the IDEA from Falmouth because the Does had withdrawn their consent to his receipt of them.

After a five-day hearing in early March 2020, the hearing officer concluded that Falmouth had denied John a FAPE from January 2018 to March 2019 and from September 2019 through February 2020. In explaining why, the hearing officer addressed the January 2018, January 2019, and September 2019 IEPs.[3]

First, the hearing officer determined that the January 2018 IEP was not "reasonably calculated to provide [John] with a FAPE" because of its reliance on SPIRE.  The hearing officer explained that, starting in January 2018, Falmouth had "failed to take . . . meaningful steps to address [John's] unique circumstances and challenges with regard to his orthographic

_____

[2] The Does had initially filed for a hearing in October 2019, but they withdrew that request before the hearing.

[3] Although the November 2019 IEP was proposed within the period that the hearing officer determined John was denied a FAPE, neither the hearing officer nor the District Court based any legal conclusions on this IEP and the parties make no arguments concerning it.

processing disability, which by this time was known by [Falmouth]." The hearing officer pointed to Falmouth's failure to request additional evaluations focused on John's orthographic processing and its continued reliance on SPIRE programming, rather than "consider[ing] a change in the methodology being used for [John's] programming." The hearing officer, quoting Dunn, specifically identified "the Seeing Stars program that Ms. Dunn, Ms. Melnick, and others testified was 'specifically designed for children who have orthographic dyslexia'" as an alternative methodology.

Next, the hearing officer turned to the January 2019 IEP, which the Does rejected. The hearing officer called that IEP "a step in the right direction," but "too little, too late," given Falmouth's "reluctance to conduct further evaluations" and its staff's lack of "experience[] in delivering" LMB programs.

Finally, the hearing officer addressed the September 2019 IEP, and concluded that it "was not reasonably calculated and reasonably ambitious to enable [John] to make appropriate progress in light of his circumstances." In support of that conclusion, the hearing officer found it "incongruous that [Falmouth] seemed to hold out hope that the SPIRE program would work for [John] after two years of limited progress," even as it "offer[ed] and then abruptly remove[d] the LiPS program, declaring that it was 'ineffective' after [John] had only incorporated it into his learning for a period of six months."

The hearing officer then determined that "the Aucocisco School is an appropriate placement" for John. And, based on that determination, the hearing officer ordered Falmouth to reimburse the Does for the cost of John's Aucocisco tuition from January 28, 2019 to September 2019, and the 2019-2020 school year, along with certain other expenses.

**D.**

Falmouth brought an action under the IDEA in the District of Maine in which it challenged the hearing officer's ruling that John had been denied a FAPE for the periods in question. Falmouth also challenged the remedial order on separate grounds.

The Does answered and brought counterclaims against Falmouth under Section 504 of the RHA and Title II of the ADA. The Does also brought a counterclaim against Kucinkas under 42 U.S.C. § 1983 alleging retaliation against them in violation of their rights under the First Amendment. Falmouth moved to dismiss the counterclaims under Federal Rule of Civil Procedure 12(b)(6).

Falmouth moved for summary judgment, as did the Does, as to Falmouth's civil action under the IDEA in which it challenged the hearing officer's orders in favor of the Does. See Sebastian M., 685 F.3d at 84-85 ("[A] motion for summary judgment in an IDEA case is simply a vehicle for deciding the relevant issues."). The District Court granted judgment to the Does, sustaining the hearing officer's order finding that John was denied a FAPE during the

periods of time in question and holding that the hearing officer's order of reimbursement was "an appropriate remedy" for Falmouth having denied John a FAPE under those IEPs.

Falmouth and Kucinkas moved to dismiss the Does' counterclaims against each of them under Federal Rule of Civil Procedure 12(b)(6).  In an order issued contemporaneously to its order affirming the hearing officer's decision, the District Court granted the motion and dismissed the counterclaims.  Falmouth timely filed a notice of appeal of the District Court's rulings against it and the Does cross-appealed from the dismissal of their counterclaims against Falmouth and Kucinkas.

## II.

Falmouth brings various challenges that apply to the District Court's ruling with respect to both of the periods of time in which the hearing officer found that Falmouth denied John a FAPE.  In some of them, Falmouth does so without focusing on any ruling by the District Court that concerns only a specific period within that overall time span rather than the time span as a whole.  In those broadly applicable challenges, Falmouth alleges that the District Court's assessments of the specific IEPs that Falmouth had proposed for John during that overall time span were plagued by flaws that apply equally to each of those assessments.  We thus begin our analysis by examining this set of contentions, before then turning to the more time-period-specific challenges that

Falmouth also brings to the District Court's ruling that John was denied a FAPE and that direct our attention to the District Court's assessments of certain ones of the IEPs at issue.

"We review the district court's determinations of law de novo, and its findings of fact for clear error. 'Where the case raises mixed questions of law and fact, we employ a "degree-of-deference continuum," providing "non-deferential plenary review for law-dominated questions" and "deferential review for fact-dominated questions."'" Johnson v. Bos. Pub. Schs., 906 F.3d 183, 191 (1st Cir. 2018) (internal citation omitted) (quoting Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 76 (1st Cir. 2016)). In an IDEA case such as this one, we do not employ the typical presumptions that accompany summary judgment motions. Sebastian M., 685 F.3d at 85.

**A.**

Falmouth first contends that the District Court erred in concluding that John had been denied a FAPE during the time periods in question because the District Court based that conclusion on the finding that SPIRE does not "address" orthographic processing. Falmouth contends that the record compels the conclusion that SPIRE does "specifically address[] . . . orthographic processing issues." For that reason, Falmouth contends that the District Court wrongly concluded that none of the IEPs that were either implemented or proposed during the time periods in question was

"reasonably calculated" to ensure that John would receive a FAPE, Endrew F., 137 S. Ct. at 999. And so, Falmouth contends, for this reason alone the District Court's ruling that Falmouth denied John a FAPE during this time cannot stand.

But, the District Court did not base the ruling that Falmouth denied John a FAPE during the periods at issue on the mistaken finding about SPIRE that Falmouth attributes to it. Rather, we understand the District Court to have concluded only that the preponderance of the evidence supported the hearing officer's conclusion that none of the IEPs at issue were "reasonably calculated," id., to ensure that John would receive a FAPE, because none used Seeing Stars or a similar program and so none was "specially designed," id., to address John's specific orthographic processing deficit, given both what the record showed about the acuity of that deficit and the way that Seeing Stars would be "specially designed" to address it while SPIRE would not be. Thus, this aspect of Falmouth's challenge fails for the simple reason that it takes aim at a supposedly absolute finding about the limits on the type of instruction that SPIRE could provide that the District Court did not make.

Falmouth appears to advance a related contention, however. Here, Falmouth argues that the District Court erred in ruling that Falmouth denied John a FAPE during the time in question because it erred in assessing whether an IEP that relied on Seeing

Stars would be "reasonably calculated" to ensure that John would make appropriate progress relative to whether an IEP that relied on SPIRE would be. We see no merit to this contention either.

Falmouth does not dispute that, as the District Court pointed out, the record contains an evaluation from Lisa Melnick and Barbara Murphy of Aucocisco that specifically recommended using Seeing Stars programming to address John's specific "orthographic processing deficits."[4] Nonetheless, Falmouth contends, the District Court still erred in ruling based on that evidence that John had been denied a FAPE because of the contradictory testimony that Falmouth asserts is in the record. Here, Falmouth points solely to the testimony from the expert whom Falmouth proposed to hire to consult with its own teacher for the delivery of Seeing Stars to John under the proposed January 2019 IEP. But, the testimony from that expert, Ann Binder, does not demonstrate that the District Court's ruling must be overturned.

The record does show that Binder testified "that SPIRE . . . specifically addresses both orthographic processing issues

---

[4] We understand Murphy, Melnick, and Binder to have each testified based on both their personal knowledge of the case and in an expert capacity. The parties, hearing officer, and District Court appear to have proceeded on the assumption that the expert knowledge to which these witnesses testified was knowable to Falmouth at all relevant times. No party challenges this assumption, so we adopt the same premise.

and phonological processing issues."[5]  But, as we have just explained, the District Court did not dispute that SPIRE "address[es] orthographic processing."  So, this portion of Binder's testimony does not aid Falmouth's argument on appeal, as nothing in it purports to assess SPIRE's ability to address John's unique needs relative to Seeing Stars, given the acuity of his orthographic processing deficit.

Moreover, the other portion of Binder's testimony to which Falmouth directs our attention also is of no assistance to Falmouth.  That portion is the one in which Binder claimed that programs like SPIRE address orthography "in a much deeper way than Seeing Stars" because "each lesson [of SPIRE] is narrower."  But, in this portion of Binder's testimony, she was clearly discussing "orthography," which she later clarified is not the same as "orthographic processing" and "is not something on its own that can be taught."

Falmouth has one last related line of challenge.  It appears to be contending that, even if the more record-based contentions that we have just considered are not persuasive, our decision in Lessard v. Wilton Lyndeborough Cooperative School District, 518 F.3d 18 (1st Cir. 2008), and the Supreme Court's decision in Endrew F. require us to conclude that the District

_____

[5] We note that Seeker, too, claimed that "SPIRE tackles in an explicit way the orthographic component."

Court erred in ruling that the IEPs at issue were not "reasonably calculated," Endrew F., 137 S. Ct. at 999, to ensure that John would receive a FAPE. But, we disagree.

Lessard does state that "state and local education agencies" have discretion to "choose among competing pedagogical methodologies." 518 F.3d at 28. But, Lessard also recognizes that courts "are entrusted with ascertaining the adequacy of an IEP's educational components," id. at 29, and "adequacy" includes, as the Supreme Court made clear in Endrew F., whether "[t]he instruction offered [is] 'specially designed' to meet a child's 'unique needs' through an 'individualized education program,'" Endrew F., 137 S. Ct at 999 (emphases in original) (quoting 20 U.S.C. § 1401(14), (29)). And, the District Court, as we have explained, applied just that standard in assessing whether, notwithstanding the IEPs that Falmouth proposed, John was denied a FAPE. Thus, at least given the limited arguments that Falmouth makes about the problems with the District Court's assessment of the record, we see no basis for concluding that the District Court failed to adhere to Lessard or Endrew F. in ruling as it did.

**B.**

We next turn to Falmouth's contention that the District Court ignored the Supreme Court's command that reviewing courts must determine "[t]he adequacy of a given IEP" in light of "the unique circumstance of the child for whom it was created." Endrew

- 24 -

F., 137 S. Ct. at 1001. Here, Falmouth argues that the District Court erred with respect to its assessment of all the IEPs at issue, because it "ignored . . . clear evidence that John was going to progress at best slowly under any reading program, instead finding FAPE violations based on John's slow growth." It further contends in this regard that the District Court "failed to account for the unique circumstance that John was a slow learner." Accordingly, Falmouth contends, the District Court's ruling that John was denied a FAPE must be overturned.

In pressing this line of argument on appeal, Falmouth does not engage in any detailed analysis of the District Court's treatment of any of the IEPs before us. But, even if we were to conclude that Falmouth's failure in that regard does not amount to a waiver of the argument for lack of development, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), a review of the District Court's opinion shows that the District Court did account for the fact that John was "a slow learner" -- or, more precisely, that John had orthographic and phonological processing deficits -- in its analysis of each of the relevant IEPs.

The District Court began its analysis of the challenged IEPs by noting that John was "a complex child with ADHD and dyslexia." The District Court then concluded, consistent with Endrew F., that an IEP that was reasonably calculated to enable John to make progress had to address the reasons that John might

learn more slowly than his peers -- namely, his orthographic processing deficit. See 137 S. Ct. at 1001 (holding that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," and refusing to find that "an educational program providing 'merely more than de minimis progress'" met that standard). And, the District Court concluded that each of the IEPs Falmouth developed during this time period was inadequate on that score.[6] The District Court thus did, contrary to Falmouth's contention, purport to root its findings on a consideration of John's "unique circumstances," id., which the District Court supportably determined to be that John would face challenges learning to read because of his orthographic and phonological processing deficits.

## C.

Falmouth also contends that the District Court, by approvingly citing the slow gains that John made at Aucocisco while not doing the same with respect to his slow gains at Falmouth, only "selectively relied on [John's] unique circumstances." But, the District Court found that John's progress at Aucocisco was still greater than his progress at Falmouth over a much longer time, and Falmouth does not develop an argument that the District Court clearly erred in so finding. Thus, there is no basis for

---

[6] We again note that the District Court did not address the November 2019 IEP and the parties make no argument based on it.

- 26 -

concluding that the District Court acted selectively in ruling the way that it did.

## D.

Falmouth next urges us to adopt a Fourth Circuit rule that "parents will have to offer expert testimony to show that [a] proposed IEP is inadequate." See Weast v. Schaffer ex rel. Schaffer, 377 F.3d 449, 456 (4th Cir. 2004). Falmouth argues that, if we were to do so, we would have to overturn the District Court's ruling, because the Does "provided no testimony against the appropriateness of the Falmouth IEPs, and no testimony that John should have made more gains than he actually did under those Falmouth IEPs."

But, the Does provided testimony from Melnick and Murphy that John had a serious orthographic processing deficit, that SPIRE was not a program whose use made an IEP specially designed to meet John's unique needs in consequence of his having a deficit of that kind, and that a program (Seeing Stars) did exist that would have resulted in an IEP that was designed to do so if that program had been employed. Moreover, Falmouth does not argue that Melnick and Murphy were not qualified to so testify. Thus, the District Court did not err even under the framework for analysis set forth in Weast that Falmouth urges us to adopt.

Insofar as Falmouth may be understood also to be arguing that, in light of Weast, we should hold that the Does were required

to put forward experts who specifically labeled the IEPs inadequate, rather than experts who merely testified to facts based on which the District Court could supportably conclude the IEPs were inadequate, Falmouth provides no reason for us to do so. Weast does not itself provide support for such a holding because Weast does not impose any such requirement, see 377 F.3d at 456-57, and, other than invoking Weast, Falmouth make no argument for our imposing that requirement here.

**E.**

Falmouth's final challenge that applies to the District Court's ruling in favor of the Does that implicates the District Court's ruling as to the whole time-span in question -- and thus the District Court's assessment of each of the IEPs at issue -- concerns the LRE requirement. As we noted at the outset, that requirement "embod[ies] a 'preference' for 'mainstreaming' students with disabilities in 'the regular classrooms of a public school system.'" C.D., 924 F.3d at 625 (quoting Rowley, 458 U.S. at 202-03).

The District Court found that, under the IEPs at issue, John would have spent between 53% and 59% of his time in mainstream settings. It then compared that amount of time that John would have spent in mainstream settings under those IEPs to the amount of time that John would have spent in such settings under the Does' plan to have John split his days between Aucocisco and Falmouth.

- 28 -

In undertaking that comparison, the District Court found that John would have spent less time in mainstream settings under the Does' plan. But, the District Court went on to find that the difference "appears insignificant on the record presented, particularly when weighed against the clear need for educational improvement." The District Court thus concluded that, "having given due consideration to [the] IDEA's LRE mandate, . . . the IEPs Falmouth developed in January 2018 and fall of 2019 failed to provide John a FAPE."

Falmouth contends that the District Court misapplied the LRE requirement in so ruling in part because, in finding that John was denied a FAPE during the time span in question, the District Court failed to "include an analysis of the benefits for John of time in mainstream settings [] regardless of any comparison with a private arrangement" in its "assessment of Falmouth's . . . IEP." Thus, Falmouth argues, the District Court erred in ruling that none of the IEPs that Falmouth proposed during the relevant time period was "reasonably calculated," Endrew F., 137 S. Ct. at 999, to ensure that John would receive a FAPE.

Falmouth is right that, in determining whether the IEPs that Falmouth proposed during this time were reasonably calculated to ensure that John would receive a FAPE, "the benefits to be gained from mainstreaming must be weighed against the educational improvements that could be attained in a more restrictive (that

- 29 -

is, non-mainstream) environment," C.D., 924 F.3d at 631. But, the District Court did not rule otherwise. Rather, it considered the "difference in LRE time" between Falmouth's IEPs and the Does' plan and determined that the "difference in LRE time" between them "appears insignificant on the record presented, particularly when weighed against the clear need for educational improvement."

Falmouth next contends that the District Court erred in applying the LRE requirement for a different reason. Here, Falmouth contends that any assessment of whether the IEPs at issue were "reasonably calculated" to provide John a FAPE had to be made by comparing the amount of mainstream instruction that they would provide to the full-time, specialized instruction that John would receive at Aucocisco. And, Falmouth asserts, if the District Court had employed that comparison, it would have been required to determine that the LRE requirement precluded the negative assessment of the IEPs that the District Court made, because John received no mainstream instruction at Aucocisco.

But, as Falmouth acknowledges, the District Court did not purport to base the determination that John was denied a FAPE on a comparison of any of the IEPs and John's receipt of full-time instruction at Aucocisco. The District Court based that determination instead solely on a comparison between each of the IEPs and John receiving instruction partly at Falmouth and partly at Aucocisco.

Falmouth does go on to argue that even though the District Court purported to make that comparison, it was not permitted to do so. Here, Falmouth contends that, given the Does' full-time placement of John at Aucocisco and the remedial order by the hearing officer and the District Court's affirmance of it, the District Court had no choice but to determine whether John had been denied a FAPE by assessing the adequacy of the relevant IEPs based on a comparison between the type of part-mainstream, part-specialized instruction that John would receive under them and the full-time specialized instruction at Aucocisco. And, Falmouth then contends, such a comparison could not result in finding that the IEPs were inadequate, given the LRE requirement.

But, the premise that the District Court had to make the kind of comparison Falmouth asserted was required does not hold up. And, that is so whether we focus on the fact that the Does eventually placed John full-time at Aucocisco or the remedial order.

Local educational agencies in implementing IEPs must "evaluat[e] . . . marginal benefits and costs" of placements along "a continuum of possible educational environments." C.D., 924 F.3d at 631 (internal quotation marks omitted) (quoting Roland M., 910 F.2d at 992-93). And, over the course of the two periods that are the subject of this appeal, John was placed at Aucocisco for both half days and full days. Falmouth develops no argument,

though, as to why the District Court was required to focus on one part of the "continuum" concerning his placement at Aucocisco (the full-time part) rather than another (the part-time part) in determining whether the preponderance of the evidence supported the hearing officer's conclusion that John was denied a FAPE notwithstanding the IEPs that Falmouth developed. Thus, we do not see how the fact of that full-time placement suffices to show that this aspect of Falmouth's challenge has merit.

That leaves to address, then, only the question of whether the hearing officer's remedial order in and of itself demonstrates that the District Court had no choice in assessing whether the preponderance of the evidence supported the determination that the IEPs were not "reasonably calculated" to provide John with a FAPE but to compare the instruction that John would receive under those IEPs to his receiving <u>full-time</u> instruction at Aucocisco. But, the fact that a remedy for Falmouth having denied John a FAPE may require Falmouth to cover the costs of tuition for his full-time instruction at Aucocisco in no way suggests that the denial of the FAPE itself depends on the IEPs offering instruction that was inadequate only when compared to the instruction John would have received from attending that private school full-time. <u>Cf.</u> <u>Florence Cnty.</u>, 510 U.S. at 15-16 ("[O]nce a court holds that the public placement violated IDEA, it is authorized to 'grant such relief as the court determines is

appropriate.'" (quoting 20 U.S.C. § 1415(e)(2))). Thus, this contention lacks merit, too.

### III.

Falmouth does have some fallback contentions. Here, Falmouth challenges the District Court's ruling only insofar as it implicates the District Court's assessment of certain of the IEPs that Falmouth developed for John during the two periods in question. We thus turn now to these narrow-gauged contentions, which, as we will explain, also lack merit.

### A.

Falmouth first takes aim at the District Court's ruling that the January 2018 IEP was not "reasonably calculated to enable [John] to make progress appropriate in light of [his] circumstances," Endrew F., 137 S. Ct. at 999. Falmouth contends that the District Court erred in so ruling because it relied, impermissibly, on information that could not have been known to the IEP team at the time that it was developing the January 2018 IEP because that information concerned the lack of progress that John made in reading only after that IEP was in place. See Roland M., 910 F.2d at 992 ("[A]ctions of school systems cannot . . . be judged exclusively in hindsight. An IEP is a snapshot, not a retrospective."). We do not agree, however, with Falmouth's characterization of the District Court's ruling.

The District Court noted that, at the time that the January 2018 IEP was developed, "[d]espite then being in second grade, John's reading and writing skills were still at a kindergarten level" (emphasis added). The District Court further noted, again by relying only on information that was available prior to the development of that IEP, that John's "special education teacher recognized that he had an orthographic deficit and described it as his 'biggest challenge.'" And, the District Court observed that, despite this information being available as of that point in time, Falmouth nonetheless "proposed only incremental increases in the amount of specialized instruction John should receive and did not further evaluate John's orthographic issues, or reconsider the type of specialized reading instruction John might need." Indeed, the District Court found -- again, based on only the information that predated the IEP itself -- that Falmouth "essentially abandoned the preexisting measurable reading goal when John failed to reach it."

Moreover, the District Court determined that, given those findings, "the preponderance of the evidence supports a finding that the IEP Falmouth developed for John in early 2018 failed to provide programming that would allow John to make more than de minimis progress on basic reading and writing skills over the following year." And, in so ruling, the District Court pointed

to no contrary evidence in the record, seemingly because it did not identify any.

Falmouth is right that the District Court did reference John's progress under the January 2018 IEP in the course of rendering this ruling. But, we do not share Falmouth's view that the District Court relied on that post-IEP-development information in reaching the conclusion that it did. Considered in the context of the District Court's analysis as a whole, we understand the District Court's reference to that post-IEP-development information merely to have been intended to reinforce its independent ruling that, based solely on the information available to the IEP team prior to the IEP'S development, a preponderance of the evidence favored the Does' position over Falmouth's with respect to whether that specific IEP provided John a FAPE.

**B.**

Falmouth next focuses on the District Court's ruling that the January 2019 was not reasonably calculated to provide John a FAPE. Here, Falmouth appears to contend that the District Court incorrectly applied the FAPE standard to the facts before it with respect to this negative assessment of the adequacy of this IEP.[7] Once again, we are not persuaded.

---

[7] We note that Falmouth groups this argument under a heading of its brief that suggests it contends the District Court made the same error Falmouth claimed it made with respect to the January 2018 IEP by basing the FAPE determination for these IEPs on

The District Court concluded that the preponderance of the evidence supported the hearing officer's conclusion that the January 2019 IEP "fell short," and it agreed with the hearing officer that, on this record, the plan was "too little, too late," because Falmouth's "plan for implementing [Seeing Stars] programming, including utilizing a teacher, Shar Mahoney, who was not certified in LMB and lacked recent experience using LMB, was, at best, a work in progress." Falmouth contends that this conclusion was improper because the record requires us to conclude that, by agreeing "to try the LMB/Seeing Stars reading methodology" with implementation "oversee[n]" by "an outside literacy expert -- Ann Binder," while "increas[ing] even further the amount of literacy instruction" "on top of a host of other important, supportive services," Falmouth made "a reasonable calculation of how to provide John with meaningful benefits."

To support this contention, Falmouth points to the evidence in the record that it argues shows that Binder "has extensive literacy experience and is certified as an 'educational consultant' by the State of Maine." It further asserts that the

outcomes rather than on what was "objectively reasonable . . . at the time the IEP was promulgated," Roland M., 910 F.2d at 992. But, the specific arguments that Falmouth makes clearly do not posit that the District Court committed the legal error suggested by that heading with respect to the January 2019 and September 2019 IEPs. We address the arguments on their own terms and not on the terms suggested by the brief heading.

- 36 -

record shows that Mahoney, whom Binder would have overseen in providing Seeing Stars programming, is herself "a certified teacher with many years of experience, who had gone through the training for LMB services." Falmouth also critiques the credentials and experience of the leadership and tutors at Aucocisco.

But, Falmouth faces an uphill climb in pressing this challenge. The District Court impliedly found that Binder's involvement in delivering Seeing Stars programming to John would not change its conclusion with respect to whether an IEP that used Seeing Stars programming delivered by Mahoney was reasonably calculated to enable John to make progress. We apply a "deferential [standard of] review for" "mixed questions of law and fact" that are "fact-dominated." Cape Elizabeth, 832 F.3d at 76. Thus, we cannot see how there is merit to this ground for overturning the District Court's ruling in favor of the Does insofar as it is based on the determination concerning the adequacy of this IEP, given what the record shows in the relevant respects and the "due weight" that the District Court owed the hearing officer's determination, G.D., 27 F.4th at 6.

Binder's testimony demonstrated that she was dismissive towards and relatively unfamiliar with the program that she was hired to oversee. Binder's testimony also indicated that, despite Falmouth's awareness of the seriousness of John's orthographic

processing deficit, Falmouth did not communicate to Binder when it proposed to hire her that orthographic processing was a challenge for John, let alone that it was his "biggest challenge." Indeed, the record shows, Binder planned to help Mahoney stress phonological processing and phonemic awareness in John's programming, rather than orthographic processing.

Thus, we see no basis for overturning the District Court's "too little, too late" assessment on this record. As we have explained, the record provides support for finding both that John had a serious orthographic processing deficit and that Seeing Stars was specially designed to address it in a way that SPIRE was not. And, Falmouth does not contest the District Court's determination that the preponderance of the evidence supported the hearing officer's finding that that Mahoney was not herself equipped to adequately deliver Seeing Stars programming to John without assistance.[8] We therefore reject Falmouth's challenge to the District Court's ruling insofar as that challenge focuses narrowly on the District Court's asserted error in assessing the adequacy of the January 2019 IEP.

---

[8] Falmouth does note that Mahoney "is a certified teacher with many years of experience, who had gone through the training for LMB services." But, Falmouth accepts that Mahoney's "experience delivering the [Seeing Stars] program may have been limited," and raises this point solely in service of comparing Mahoney to the instructors at Aucocisco. And, Falmouth develops no argument that a person with only "limited" experience with Seeing Stars was equipped to deliver such programming to John.

Falmouth's final fallback contention concerns the District Court's assessment, in accord with the hearing officer's determination, that the September 2019 IEP "was not 'reasonably calculated to confer a meaningful educational benefit' to John" (quoting Johnson, 906 F.3d at 194) because it did not provide "specialized instruction [that] would use LMB programs" such as Seeing Stars. Falmouth contends to us, as it contended below, that it was justified, with respect to this IEP, in abandoning its proposal to use Seeing Stars because John was making slow progress at Aucocisco and because Falmouth offered instead to provide "multisensory synthetic phonics instruction" along with an additional hour per week of reading instruction. On that basis, Falmouth concludes that the District Court erred, at least in this respect, in applying the standard for determining whether a FAPE has been denied to a child to the facts of this case.

But, as we have explained, our review of this determination by the District Court is deferential due to its fact-dominated nature. See Cape Elizabeth, 832 F.3d at 76. And, the District Court, which in turn was required to give "due weight" to the hearing officer's determination, found that the preponderance of the evidence supported the hearing officer's conclusion that John was denied a FAPE by this IEP because John needed programming that would more explicitly target his orthographic processing

deficits than SPIRE did due to the acuity of that deficit. Thus, it is problematic that Falmouth points to no evidence in the record that shows that "multisensory synthetic phonics instruction" would accomplish that task in a way that its prior SPIRE instruction had not, especially given testimony that SPIRE itself included such instruction. Accordingly, this challenge, too, fails.

**IV.**

Falmouth alternatively contends that, even if the District Court did not err with regard to its ruling that John was denied a FAPE during the periods of time in question, the District Court erred in upholding the hearing officer's order that Falmouth must reimburse the Does for John's tuition at Aucocisco. Here, as well, we disagree.

A court may "order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the [IDEA]." Mr. I. ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 23 (1st Cir. 2007) (quoting Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 369 (1985)). A proper placement under the IDEA is one that provides "'some element of the special education services' missing from the public alternative" so that the placement is "reasonably calculated to enable the child to receive educational benefit." Id. at 25 (emphasis omitted) (quoting Berger v. Medina City Sch.

Dist., 348 F.3d 513, 523 (6th Cir. 2003)). We review this determination "as a mixed question of fact and law." Id. at 23.

Falmouth argues that Aucocisco was not a proper placement because it lacked any mainstreaming, "an essential and beneficial piece of programming for John." But, the issue of whether a parent's unilateral placement of their child at a private program is proper for purposes of determining the remedy for a denial of a FAPE is "a different issue, and one viewed more favorably to the parent, than the question whether [such a] placement was required in order to provide a free appropriate education to" the child. Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 33 n.5 (1st Cir. 2001). A parent's unilateral private placement may be "proper under [the] IDEA" even if a placement there would not meet all of the requirements that school districts face in providing a FAPE. Florence Cnty., 510 U.S. at 13-14. Thus, "[a]n appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement." Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999). And, in arguing that that rule should not apply here, Falmouth points only to its contention that mainstreaming was "an essential and beneficial piece of programming for John." But, the LRE mandate itself reflects that Congress has recognized "the desirability of mainstreaming" for children receiving services under the IDEA, Roland M., 910 F.2d at

993.  And, nonetheless, the IDEA allows for reimbursements for private placements in appropriate environments, even when those environments are more restrictive than what school districts propose.  See Warren G., 190 F.3d at 84.

To the extent that Falmouth is challenging whether the District Court erred in assessing that Aucocisco was a "proper" placement based on whether it provided ""'some element of the special education services' missing from the public alternative," with a "nexus between the special education required and the special education provided" at the private placement, Mr. I., 480 F.3d at 25 (quoting Berger, 348 F.3d at 523), we disagree.  Falmouth does assert that the record shows that Aucocisco was not a proper placement because "many of [John's] day-to-day instructors at Aucocisco are poorly trained, and have far less educational experience than John's Falmouth instructors."  The record evidence, however, suffices for us to defer under our standard of review for mixed questions of fact and law to the District Court's "fact-dominated," Cape Elizabeth, 832 F.3d at 76-77, ruling that the record supportably showed that the teachers at Aucocisco were adequately trained and supervised by that school's leadership, which was experienced in delivering Seeing Stars, and thus could deliver instruction with the requisite "nexus."  Moreover, the hearing officer supportably found that John made progress at Aucocisco, and the District Court agreed that it was

greater progress than he had made in the two prior years at Falmouth.

Finally, Falmouth argues that "the private program has been ineffective at addressing [John's] significant attentional difficulties." But, it identifies no portion of the record that could support this assertion, and it does not explain how Falmouth's own program is any more successful. Nor does Falmouth explain how this assertion bears on the relevant inquiry about the proper remedy under the IDEA for the denial of a FAPE. We thus consider this contention to be one "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," and, so, we "deem[] [it] waived." Zannino, 895 F.2d at 17.

**V.**

We next turn to the Does' cross-appeal from the District Court's dismissal under Federal Rule of Civil Procedure 12(b)(6) of the Does' counterclaims against Falmouth. To resolve the cross-appeal, we must accept the facts alleged in the Does' complaint as true and draw all reasonable inferences in the Does' favor. Legal Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 34 (1st Cir. 2022). To prevail, the Does need show only that their complaint includes "enough factual detail to make the asserted claim 'plausible on its face.'" Cardigan Mtn. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009)).  Our review is de novo.  Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 269 (1st Cir. 2022).

## A.

The District Court held that "the only adverse action plausibly alleged in the counterclaims is the denial and/or delay of John's rights under the IDEA" to a FAPE and that "the Does' counterclaims fail to plausibly allege that retaliatory animus or disability-based animus is what caused or motivated the decisions regarding John's IEPs."  The District Court thus ruled that the Does' ADA and RHA claims could not survive the motion to dismiss as they were, at bottom, only "disguised IDEA" claims.  As to the § 1983 count, moreover, the District Court found that the same rationale applied and alternatively found that Kucinkas was entitled to qualified immunity because he had not violated a clearly established First Amendment right held by the Does.

## B.

The Does argue that "allegations of 'disability-based animus' or 'retaliatory animus' are sufficient to differentiate Section 504/ADA discrimination and retaliation claims from an underlying IDEA action, even if the adverse action is the same." They then assert that their complaint, "viewed holistically," makes their allegations of animus as to both the ADA and Section 504 claims plausible based on "the cumulative effect of the factual allegations contained in the complaint" (quoting A.G. ex rel.

<u>Maddox</u> v. <u>Elsevier, Inc.</u>, 732 F.3d 77, 82 (1st Cir. 2013)). We do not agree.

**1.**

With respect to the Does' challenge to the District Court's order dismissing their ADA and RHA claims insofar as they are based on retaliation, all of the Does' allegations concern conduct that Falmouth undertook <u>before</u> the Does requested a Section 504 plan. And, while the Does allege that Falmouth continued its conduct after the Does requested that plan, the complaint does not allege that Falmouth in fact responded to the request in any way besides developing and implementing a Section 504 plan for John. Nor do the Does develop an argument that they engaged in any other conduct that is protected under the ADA and RHA that did not occur after the allegedly adverse actions by Falmouth. Thus, the District Court did not err in finding that the Does had not adequately alleged retaliation.

**2.**

We turn next to the Does' claim that they adequately pleaded discriminatory animus with respect to their ADA and RHA claims. The District Court acknowledged that claims under the ADA or RHA can survive even when they have some overlap with a claim under the IDEA. Nonetheless, the District Court held that the allegations in the Does' complaint were insufficient to plead the "disability-based animus" that the Does agree must have been

pleaded for their claims to go forward. The District Court not only concluded "that the requisite animus was not plead in the counterclaim," but also that "nothing in the record . . . would support an inference of retaliatory animus or disability-based animus as motivating the denial of a FAPE." It concluded instead that "Falmouth's IEPs for John reflect a failure on the part of Falmouth to meet the standards required by the IDEA, but not an attempt to discriminate against John or retaliate for his parents' advocacy on his behalf."

In response, the Does merely recite a laundry list of allegations, "the cumulative effect" of which is, they contend, "a pattern of conduct" and "a pattern of deliberate indifference to John's plight due to the nature of his disability." See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14-15 (1st Cir. 2011) ("No single allegation" in a complaint "need lead to the conclusion . . . of some necessary element, provided that, in sum, the allegations of the complaint make the claim as a whole at least plausible."). They do not cite any analogous case, and they do not explain how the District Court erred. Cf. A.G., 732 F.3d at 80-82 (rejecting a claim that a complaint could survive a motion to dismiss in light of "the cumulative effect of the factual allegations" where the complaint was found to be "speculative" in crucial respects). In light of the conclusory manner in which the Does have chosen to press their challenge to this aspect of the

District Court's ruling, we reject their challenge and affirm the District Court's dismissal of their claims under the ADA and Section 504 insofar as they allege discriminatory animus.

## C.

We come, then, to the Does' challenge to the District Court's dismissal of their counterclaim under § 1983 against Kucinkas. The Does contend that their complaint plausibly alleges that Kucinkas's conduct violated their First Amendment rights because he acted with retaliatory animus, and the District Court thus erred in dismissing this count. The Does further contend that the District Court erred by alternatively finding that Kucinkas was entitled to qualified immunity. They argue that Kucinkas's violated a "clearly established" right under the federal constitution, specifically "[t]he right of parents to be free from retaliation for exercising their First Amendment right to advocate for their child's rights."

We need not address qualified immunity because the Does' complaint does not plausibly allege a claim against Kucinkas under § 1983. For their claim to survive a motion to dismiss, the Does' complaint must allege that "(1) [they] engaged in constitutionally protected conduct, (2) [they were] subjected to an adverse action by [Kucinkas], and (3) the protected conduct was a substantial or motivating factor in the adverse action." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012). In this context,

we understand the third prong of this test to essentially be an inquiry into whether the Does have alleged that Kucinkas had "retaliatory animus." See Maloy v. Ballori-Lage, 744 F.3d 250, 253 (1st Cir. 2014). Even assuming the Does have plausibly alleged facts that satisfy the first two prongs of that test, the District Court was correct to dismiss their counterclaim under § 1983 because they have failed to allege the requisite retaliatory animus.

In support of their argument otherwise, the Does again point to "'the cumulative effect of the factual allegations' contained in the[ir] complaint," A.G., 732 F.3d at 82 (quoting Ocasio-Hernández, 640 F.3d at 14), and argue that those allegations -- including allegations that Kucinkas "engag[ed] in intentional misrepresentation designed to chill their advocacy, willfully conceal[ed] critical information about the nature of John's learning disability, . . . den[ied] the existence of specialized reading instruction to target his disability," and "attempt[ed] to interfere with John's receipt of the instruction he needed from Aucocisco, while maintaining mainstream contact with the Falmouth Elementary School" -- plausibly allege retaliatory animus. They also note the "temporal proximity" "between the protected conduct" and what they deem to be "the retaliatory response."

The Does do not contend, however, that any inadequate or unreasonable response to a request that parents make in the course

of a dispute over whether their child is being given the services needed to ensure that the child is receiving a FAPE may fairly be characterized as "retaliation."  And, a review of the allegations in the complaint that are asserted to plausibly show that Falmouth engaged in retaliatory conduct here, within the meaning of the First Amendment, shows, at best, only one that possibly could ground such a claim.  That allegation concerns Kucinkas's alleged "attempt[] to interfere with John's receipt of the instruction he needed from Aucocisco" by, when the Does decided to send John to Aucocisco each afternoon in January 2019, "insist[ing] that John continue to receive specialized instruction from Falmouth's teachers during the portion of the day he spent at Falmouth Elementary School" rather than allowing him to spend his mornings solely in his mainstream classroom.

But, the Does concede in their briefing to us that they revoked consent for John to receive services under the IDEA only after Kucinkas made that decision.  Thus, we do not see how the Does can argue that they have plausibly alleged that Kucinkas's alleged "interfere[nce]" was anything other than his attempt to ensure that Falmouth was fulfilling its duties under the IDEA, given that John was eligible for services under the IDEA, the Does had consented to John receiving such services, and -- as Falmouth was not, at the time, paying for John's tuition at Aucocisco -- specialized education in the morning outside of his mainstream

classroom was the only service Falmouth was providing John to ensure he received a FAPE. For, there is nothing in the complaint that would provide a basis for concluding otherwise. Cf. Carreras v. Sajo, García & Partners, 596 F.3d 25, 38 (1st Cir. 2010) (noting that, in the employment context, "suspicions raised by temporal proximity 'can be authoritatively dispelled . . . by an employer's convincing account of the legitimate reasons for the firing'" (ellipses in original) (quoting Holloway v. Thompson Island Outward Bound Educ. Ctr., 275 F. App'x 25, 27 (1st Cir. 2008))).

**VI.**

**Affirmed**.